205 S.W.3d 343 (2006)
In re T.K.Y.
Supreme Court of Tennessee, at Nashville.
March 21, 2006 Session.
August 28, 2006.
*345 Eric J. Burch, Manchester, Tennessee, for the Appellant, T.P.
J. Stanley Rogers and Christina Henley Duncan, Manchester, Tennessee, for the Appellees, K.Y. and D.Y.

OPINION
E. RILEY ANDERSON, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and ADOLPHO A. BIRCH, JR., JANICE M. HOLDER, and CORNELIA A. CLARK, JJ., joined.
We granted review in this parental termination case to decide whether the Court of Appeals erred in determining that the parentage petition filed by the minor child's biological father should be denied and that the husband of the child's biological mother should be declared the father. Having reviewed the record and applicable *346 authority, we reverse the Court of Appeals and hold that the biological father is both the "father" under the parentage statutes and the "legal father" for purposes of the adoption and termination statutes. We also modify the trial court's order of support under the unique circumstances of this case. We remand for a modification of the support order consistent with this opinion.

Factual and Procedural Background
The facts in this case are straightforward and largely undisputed. Mr. and Mrs. Y.[1] have been married since 1988. In November 1996, Mrs. Y. began an extra-marital affair with Mr. P. In January 1997, Mrs. Y. discovered that she was pregnant. She told Mr. P. that she believed he was the father. Mr. Y. assumed that he was the child's biological father, however, and Mrs. Y. did not disabuse him of his assumption.
The affair between Mrs. Y. and Mr. P. continued after the birth of the child, T.K.Y., on October 3, 1997. Mr. P. saw T.K.Y. approximately eighteen times over the next twenty-one months in conjunction with his clandestine meetings with Mrs. Y., but did not have any set parenting time with him. Mr. P. testified that he offered to provide support to Mrs. Y. for T.K.Y., but Mrs. Y. did not want to receive any money or support from Mr. P. because she did not want Mr. Y. to know that Mr. P. was T.K.Y.'s biological father. Mr. P. also testified that Mrs. Y. led him to believe that she was going to leave Mr. Y. to be with him, and so he acquiesced in her requests that the affair and his parentage be kept secret.
In early July 1999, losing patience with the situation, Mr. P. threatened to pursue a paternity action to establish that he was the father of T.K.Y. On July 7, 1999, Mrs. Y. told Mr. Y. that Mr. P. was the father of T.K.Y. Mr. and Mrs. Y. remained married after Mrs. Y. revealed her affair with Mr. P., and Mr. Y. has continued to hold T.K.Y. out to the world as his child.
Shortly thereafter, on August 23, 1999, Mr. P. filed a petition with the Coffee County Juvenile Court for the joint purposes of establishing his parentage, custody, visitation, and to set child support. T.K.Y. was then twenty-two months old. Mr. and Mrs. Y. filed an answer denying Mr. P.'s claim of parental rights. They also filed a counter-petition asserting that Mr. Y. was the legal father of T.K.Y. and seeking to terminate Mr. P.'s parental rights. In addition, on October 14, 1999, Mr. and Mrs. Y. filed a petition for a restraining order prohibiting any contact by Mr. P. with the Y. family. In early October of 2000, Mr. and Mrs. Y. amended the petition seeking a restraining order prohibiting contact by Mr. P. with Mr. and Mrs. Y. and T.K.Y. On December 12, 2000, the juvenile court entered an agreed mutual restraining order that prohibited each party from contacting the other and prohibited Mr. P. from contacting T.K.Y. in any manner.
Two and one-half years after Mr. P. filed the parentage petition, the case was finally tried before the juvenile court in March 2002. In that proceeding, the parties stipulated to the admissibility and accuracy of DNA tests that revealed a 99.95% probability that Mr. P. was the biological father of T.K.Y. However, the juvenile court did not hear or decide Mr. P.'s pending parentage petition. Rather, following a full evidentiary hearing on the counter-petition of Mr. and Mrs. Y., the court terminated Mr. P.'s parental rights by order entered March 13, 2002, and dismissed his parentage action. Mr. and Mrs. Y. had argued *347 that Mr. P.'s parental rights should be terminated on the grounds of willful failure to support; willful failure to visit; and failure to file a petition within thirty days after notice that he was the father of the child pursuant to Tennessee Code Annotated section 36-1-113(g)(9)(A)(vi). The juvenile court decided that there was insufficient evidence to find willful failure to support or visit, but held that Mr. P. had failed to file his petition to establish parentage within thirty days of being informed by Mrs. Y. that he was the father of the child.
The court then conducted a best-interests analysis and found that termination was in the best interests of T.K.Y. because the child was "in a safe environment and safe home," and because Mr. Y. had "established a meaningful relationship" with the child and was able to provide financially for the child. Finally, the juvenile court noted that Mr. Y. "has demonstrated a stability and a perseverance that the Court feels is highly commendable and will have a long-term positive impact on [T.K.Y.]." The court acknowledged that there was "insufficient evidence to find willful failure to support or visit" by Mr. P., but nevertheless found that because there was no "regular visitation" or "regular support," the best-interests analysis weighed in favor of termination. From the juvenile court's decision, an appeal was filed by Mr. P.
Seventeen months after the juvenile court decision, on September 2, 2003, the Court of Appeals reversed and remanded. In re T.K.Y., No. M2002-00815-COA-R3-JV, 2003 WL 1733583 (Tenn.Ct.App. Sept. 2, 2003). The Court of Appeals reasoned that in light of the Supreme Court's decision in Jones v. Garrett, 92 S.W.3d 835 (Tenn.2002), the juvenile court had erred in terminating Mr. P.'s parental rights without first adjudicating his parentage petition. Jones held that the parentage and adoption statutes, as well as the state and federal constitutions, require that parentage be determined prior to determining the questions of termination or adoption. Jones, 92 S.W.3d at 839 (citing Tenn.Code Ann. § 36-1-117(b)). Because the grounds for termination available in Tennessee Code Annotated section 36-1-113(g)(9)(A) do not apply to a person who is "the legal parent or guardian of a child," the Court of Appeals held that the juvenile court should have determined Mr. P.'s parentage petition before terminating his parental rights.[2] In remanding the case "for an early hearing on Mr. P.'s Petition to Establish Paternity," the appellate court instructed, "[b]ased on the parties' prior stipulation that Mr. P. is the biological father of T.K.Y., then the Juvenile Court shall determine issues regarding the proper, primary residential parent, shared parenting, support and other issues for T.K.Y."
On remand, in April 2004, seven months after the Court of Appeals reversed, the juvenile court held a trial to determine Mr. P.'s parentage action. Mr. and Mrs. Y. contested the petition. Although they acknowledged that Mr. P. was the biological father, they argued that because Mr. Y. was married to Mrs. Y. and held T.K.Y. out to the world as his natural child, he had an equivalent claim to fatherhood. *348 Following the April 2004 trial, the juvenile court ruled that Mr. P. was the "legal father" of T.K.Y. The court based its decision on the fact that Mr. P. is the biological father of the child and the fact that Mr. P. had made efforts to establish support and parentage. The court reasoned,
if there had been no effort to establish support, no prior petitions filed, no effort [by Mr. P.], I would findprobably find he is not the father, the legal father of the child. He started this. He started it with a petition asking the Court to legitimate the child and asking the Court to establish or set support. That began back in 19August of 1999. So for me to say that he was not willing to support the child really flies in the face of the facts.
Having determined that Mr. P. was the legal father, the juvenile court set support and visitation, and ordered payment of child support back-dated to T.K.Y.'s birth, with the arrearage totaling $31,590.00. Child support was set at $405.00 per month based on Mr. P.'s average income of $28,500 earned from his work as a hairdresser. The court also ordered Mr. P. to pay one-half of Mrs. P.'s birthing and prenatal expenses, one-half of the cost of insurance for T.K.Y., and one-half of all future uncovered medical and dental expenses for T.K.Y.
Mr. and Mrs. Y. again appealed. On February 10, 2005, the Court of Appeals reversed the juvenile court's determination that Mr. P. was the child's legal father. Looking to Tennessee Code Annotated section 36-2-304(a), which sets forth five circumstances under which "[a] man is rebuttably presumed to be the father of the child," the Court of Appeals reasoned that both Mr. Y. and Mr. P. were "armed with a rebuttable statutory presumption of parentage." Mr. Y. was married to Mrs. Y., the mother at the time the child was born, and he has received T.K.Y. into his home and held the child out to the world as his natural child. See Tenn.Code Ann. § 36-2-304(a)(1), (4). Mr. P., on the other hand, had been shown through genetic testing to be the child's father to a 99.95% probability. See id. § -304(a)(5). According equal weight to the presumptions, the Court of Appeals resolved the dispute in favor of Mr. Y. by balancing the stability of T.K.Y.'s family environment, the strength of his relationship with Mr. Y., and the fact that Mr. and Mrs. Y. have been his sole source of financial support against Mr. P.'s lack of relationship with the child and his lack of actual support of the child.
At the time of the Court of Appeals' first decision in September of 2003, Mr. P. had had no contact with T.K.Y. since the filing of the petition for a restraining order in October of 1999. Following the Court of Appeals' decision, Mr. P. requested a visit with T.K.Y. A one-hour visit was arranged at a McDonald's restaurant on December 26, 2003, with T.K.Y. accompanied by Mr. Y. A second one-hour visit occurred on February 22, 2004. The record does not indicate whether there has been further contact between Mr. P. and T.K.Y. since the February 2004 visit, but at oral argument counsel for Mr. P. stated that Mr. P. and T.K.Y. had had "limited" visitation between December 2003 and February 2005. Following the Court of Appeals' decision in February 2005, Mr. P. timely appealed to this Court.

Analysis
Mr. and Mrs. Y. argue that the Court of Appeals correctly determined that Mr. Y. is the legal father of T.K.Y. They argue alternatively that, should this Court determine that Mr. P. is T.K.Y.'s legal father, the support ordered by the trial court should be increased. Mr. P. argues that *349 the Court of Appeals erred in reversing the trial court's determination that he is T.K.Y.'s legal father and argues that this Court should decrease the support ordered by the trial court. We first consider the parentage issue.

I. Paternity
Both the juvenile court and the Court of Appeals declared a "legal father" of T.K.Y. The juvenile court concluded that Mr. P. was T.K.Y.'s legal father; the appellate court reversed and held that Mr. Y. was the legal father. The determination of the child's legal father is a two-step process. First, we look to the parentage statutes, Tennessee Code Annotated sections 36-2-301 to -322, to determine the child's father. Then, we look to the adoption and termination statutes to determine whether the parentage father is also the legal father. See id. §§ 36-1-101 to -142.

A. Determining the "Father"
We must first determine whether, under Tennessee's statutory parentage scheme, Mr. Y. or Mr. P. is the father of T.K.Y. In 1997, the formerly-separate paternity and legitimation statutes were "completely overhauled." In re C.K.G., C.A.G. & C.L.G., 173 S.W.3d 714, 724 (Tenn.2005). Although the statute creates "a single cause of action for establishing parentage," id. at 722 (emphasis added), its focus remains on establishing paternity. See id. at 723. The parentage statute provides:
(a) A man is rebuttably presumed to be the father of a child if:
(1) The man and the child's mother are married or have been married to each other and the child is born during the marriage or within three hundred (300) days after the marriage is terminated by death, annulment, declaration of invalidity, or divorce;
(2) Before the child's birth, the man and the mother have attempted to marry each other in compliance with the law, although the attempted marriage is or could be declared illegal, void and voidable;
(3) After the child's birth, the man and the mother have married or attempted to marry each other in compliance with the law although such marriage is or could be declared illegal, void, or voidable; and:
(A) The man has acknowledged his paternity of the child in a writing filed under the putative father registry established by the department of children services, pursuant to § 36-2-318; or
(B) The man has consented in writing to be named the child's father on the birth certificate; or
(C) The man is obligated to support the child under a written voluntary promise or by court order;
(4) While the child is under the age of majority, the man receives the child into the man's home and openly holds the child out as the man's natural child; or
(5) Genetic tests have been administered as provided in § 24-7-112, an exclusion has not occurred, and the test results show a statistical probability of parentage of ninety-five percent (95%) or greater.
Tenn.Code Ann. § 36-2-304(a) (2005). As discussed by the Court of Appeals, Mr. Y. has the benefit of presumptions (1) and (4), while Mr. P. has the benefit of presumption (5). The Court of Appeals noted that the statute does not accord any greater weight to one presumption than the other, and so, declaring a "tie" between Mr. P. and Mr. Y. under the statute, the Court of Appeals proceeded to consider factors going *350 to the best interests of the child to make its paternity determination.
The Court of Appeals was correct that, in and of itself, section 36-2-304 does not evince a preference for one method of proving paternity over another. In our view, however, the Court of Appeals erred by reading section 36-2-304 in isolation from the entire statutory scheme governing parentage. "In ascertaining the intent of the legislature, this Court may look to the language of the statute, its subject matter, the object and reach of the statute . . . and the purpose sought to be accomplished in its enactment." In re C.K.G., 173 S.W.3d at 722 (citations and quotations omitted). When the parentage statutory scheme is viewed its in entirety, it becomes clear that we must not read a portion of it, i.e. section 36-2-304, as according equal weight to biological fathers and other claimants to paternity because the very point of the parentage statutes is to determine the biological father of a child.
The parentage statute includes the following definitions:
(1) "Child born out of wedlock" means a child born to parents who are not married to each other when the child was born;
* * *
(3) "Father" means the biological father of a child born out of wedlock;
* * *
(5) "Parent" means the biological mother or biological father of a child, regardless of the marital status of the mother and father; and
(6) "Father," "mother," and "parent" do not include a biological parent whose parental rights have been terminated for a child whose parentage is at issue.
Tenn.Code Ann. § 36-2-302 (2005). Thus, under the definition of "father" in the parentage statute, whomever is the biological father of a child is the child's father. Id. § -302(3). Likewise, a "parent" under the parentage statute is the biological mother or biological father. Id. § -302(5). A biological parent is only denied the status of "father" or "mother" if his or her parental rights have been terminated. Id. § -302(6).
Four of the five statutory presumptions are based on the traditional view that the biological mother's husband is assumed to be the biological father of her child, particularly if he takes affirmative steps to acknowledge paternity. The fifth presumption is based upon the modern-day availability and accuracy of genetic testing. It provides that if genetic tests "show a statistical probability of parentage of ninety-five percent (95%) or greater," the man is rebuttably presumed to be the biological father. Id. § 36-2-304(a)(5). A man seeking to disprove paternity may still attempt to do so even if genetic testing shows a statistical probability of 95% or greater that he is the biological father. See Tenn.Code Ann. § 24-7-112(b)(2)(B) (2000). If genetic testing shows a statistical probability of 99% or greater, however, a man who contests paternity may only do so by establishing by clear and convincing evidence one or more of the following:
(i) The putative father had undergone a medical sterilization procedure prior to the probable period of conception, or other medical evidence demonstrates that he was medically incapable of conceiving a child during the probable period of conception;
(ii) That the putative father had no access to the child's mother during the probable period of conception;
(iii) That the putative father has, or had, an identical twin who had sexual relations with the child's mother during the probable period of conception; or

*351 (iv) The putative father presents evidence in the form of an affidavit that another man has engaged in sexual relations with the mother of the child in question during the period of probable conception. In this case, the court shall order genetic testing of that other man in conformity with this section. The results of that genetic test must indicate that the other man has a statistical probability of paternity of ninety-five (95%) or greater to establish an effective defense pursuant to this subdivision.
Id. -112(b)(2)(C)(i)-(iv). In this case, genetic testing showed a 99.95% statistical probability that Mr. P. was T.K.Y.'s biological father. Were Mr. P. to contest paternity, the law would prevent him from succeeding unless he could prove one of the four circumstances set forth above. Thus, the parentage statute presumes that, absent strong, specific evidence to the contrary, a man in Mr. P.'s position is the father of the child. Moreover, the parties do not contest the fact that Mr. P. is the biological father of T.K.Y. Under the parentage statutes, because Mr. P. is T.K.Y.'s biological father, he is the child's father, as defined in the parentage statute.

B. Determining the "Legal Father"
Next, we consider the question of who is T.K.Y.'s legal father. Unlike the parentage statute, the adoption and termination statutes are not concerned solely with identifying a child's biological father. Rather, the statutes provide a framework for determining the legal father of a child. A legal father's rights may only be terminated pursuant to statutory procedures. See Tenn.Code Ann. § 36-1-113 (2005). The legal father may or may not be the biological father of a child. The adoption and termination statutes contain these definitions:
"Biological parents" means the woman and man who physically or genetically conceived the child who is the subject of the adoption or termination proceedings. . . .
* * *
"Legal parent" means:
(A) The biological mother of a child;
(B) A man who is or has been married to the biological mother of the child if the child was born during the marriage or within three hundred (300) days after the marriage was terminated for any reason, or if the child was born after a decree of separation was entered by a court;
(C) A man who attempted to marry the biological mother of the child before the child's birth by a marriage apparently in compliance with the law, even if the marriage is declared invalid, if the child was born during the attempted marriage or within three hundred (300) days after the termination of the attempted marriage for any reason;
(D) A man who has been adjudicated to be the legal father of the child by any court or administrative body of this state or any other state or territory or foreign country or who has signed, pursuant to §§ 24-7-113, 68-3-203(g), 68-3-302 or 68-3-305(b) [providing for the father's name to be entered on the child's birth certificate with the mother's consent], an unrevoked and sworn acknowledgment of paternity under the provisions of Tennessee law, or who has signed such a sworn acknowledgment pursuant to the law of any other state, territory, or foreign country; or
(E) An adoptive parent of a child or adult.
* * *
"Parent(s)" means any biological, legal, [or] adoptive parent(s). . . .
*352 Tenn.Code Ann. § 36-1-102(10), (28), (36) (2005). Based on the statutory definitions under the termination and adoption statutes, then, the biological father is not automatically the legal father of a child. Rather, he is only the legal father if he is married to the mother at the probable time of conception or if he has been adjudicated to be the legal father. Id. § -102(28). Although the parentage statutes use the term "father" rather than "legal father," the only logical reading of the parentage statute is that a man who has been adjudicated to be the father under the parentage law has also been adjudicated to be the legal father of the child. If that were not the case, a biological father could never be the legal father of his child unless he were married to the biological mother. Such a reading would be both incorrect and unconstitutional. See In re Swanson, 2 S.W.3d 180, 186 (Tenn.1999) (citing State v. Hudson, 562 S.W.2d 416, 418-19 (Tenn.1978)) ("We recognize that there are occasions in which it is appropriate to reject a literal reading of a statute when it would result in the statute being declared unconstitutional.").
The adoption and termination statutes, i.e., Tennessee Code Annotated sections 36-1-101 to -142., appear to give a preference to a man in Mr. Y.'s situation, absent an adjudicative proceeding. If there has been an adjudicative proceeding, as there was in this case, the statute again appears to create a "tie" between the biological father and the man who is married to the biological mother, because it does not tell us how to choose when two men satisfy the definition of "legal parent." Viewing the parentage, adoption and termination statutes as a whole, and in light of the constitutionally-protected rights of biological parents, however, our view is that the rights of the biological father are superior.
First, as we held in Jones, where there is a petition to establish paternity, that petition must be decided prior to any adoption or termination proceedings. Jones, 92 S.W.3d at 839; see also Tenn. Code Ann. § 36-1-117(b)(2) (2005) ("The paternity petition shall be heard and concluded prior to any action by the adoption court to determine whether to grant the petition for adoption."). The statute further provides that once paternity has been established, the biological father becomes the legal father, and his rights may only be terminated as "as provided by § 36-1-113 or otherwise provided by law." Id. § 36-1-117(b)(3)(B). Thus, the statute implicitly recognizes that the rights of the biological father are superior to the rights of another would-be father.
Second, as we have consistently emphasized, the rights of biological parents are protected by both the state and federal constitutions. Jones, 92 S.W.3d at 840; see also In re D.A.H., 142 S.W.3d at 274 ("right of biological parents to have the care and custody of their children" is "constitutionally-protected, fundamental right"); Blair v. Badenhope, 77 S.W.3d 137, 141 (Tenn.2002); Nale v. Robertson, 871 S.W.2d 674, 680 (Tenn.1994). Once the biological father has established his paternity, his constitutionally-protected fundamental right to parent his child vests and he is the legal father. That right may only be stripped pursuant to the statutory parental termination proceduresit may not be forfeited in a balancing test or to another man who may appear to be a more ideal father.

C. Court of Appeals' Action
Without making any reference to the statutory definition of "legal parent" in Tennessee Code Annotated section 36-1-113, the Court of Appeals determined that Mr. Y. was the legal father of T.K.Y. Relying *353 on its decision in State ex rel. Cihlar v. Crawford, 39 S.W.3d 172 (Tenn.Ct.App. 2000), the Court of Appeals held that because Mr. Y. and Mr. P. both satisfied the presumptions in the paternity statute, Tenn.Code Ann. § 36-2-304(a), the question of legal parenthood was to be determined using a best-interests-type analysis, considering "the existence of a family unit, the stability of the family environment, sources of the child's support, the child's relationship with the presumptive father(s), and the child's physical, mental and emotional needs." See Cihlar, 39 S.W.3d at 185. However, as we have explained, that analysis omitted the critical step of recognizing that, pursuant to the statutory scheme, Mr. P. is not merely the biological father but he is also the legal father. Therefore, his parental rights may only be terminated pursuant to the statute, and a best-interests analysis is relevant if and only if termination is appropriate. Unless and until grounds for termination of Mr. P.'s rights have been proven, he is the legal father of T.K.Y.

D. Failure to Visit or Support
The juvenile court did not explicitly decide the question of termination, but held that the evidence did not support Mr. and Mrs. Y.'s arguments that Mr. P. willfully failed to visit or support the child. The evidence does not preponderate against the trial court's determination. The evidence shows that Mrs. Y. actively concealed T.K.Y.'s true parentage for over a year and a half, and that Mr. P. acquiesced in her requests that T.K.Y.'s true parentage be kept secret. Mr. P. testified that he offered to provide support to T.K.Y. but that his offer was declined due to Mrs. Y.'s desire to keep the affair secret. As the juvenile court noted, Mr. P. began actively pursuing his rights in July 1999. He filed a petition to establish parentage, custody, visitation, and to set child support on August 23, 1999. However, he was prevented from seeing T.K.Y. for over four years. On October 14, 1999, seven weeks after Mr. P. filed his parentage petition, Mr. and Mrs. Y. filed a petition for a restraining order prohibiting any contact between Mr. P. and the Y. family. Mr. P. voluntarily complied with Mr. and Mrs. Y.'s wishes until October of 2000, when he attempted to send a gift on T.K.Y.'s birthday. Shortly thereafter, the Y.'s renewed their request for a restraining order, and in December 2000 the parties entered into a mutual agreed restraining order restricting Mr. P. from all contact with T.K.Y. Mr. P. remained subject to this restraining order from December 2000 until March 2002, when the juvenile court terminated Mr. P.'s parental rights. The termination was in effect until the first Court of Appeals decision in September 2003. Thereafter, Mr. P. only had the opportunity to reestablish visitation and a relationship with T.K.Y. until the second Court of Appeals decision in February 2005. In sum, we affirm the juvenile court's determination that the evidence did not support Mr. and Mrs. Y.'s arguments that Mr. P. willfully failed to visit or support the child.

II. Support
Mr. P. argues that the juvenile court erred in awarding child support to the date of the child's birth because his parental rights were terminated from March 2002 to September 2003 and because, even before his rights were legally terminated, Mr. and Mrs. Y. interfered with his relationship with his son. We address each argument in turn.

A. Effect of Parental Termination on Support Obligation
First, we agree that the juvenile court erred in awarding back child *354 support for the two periods during which Mr. P.'s parental rights were terminated, March 13, 2002 to September 2, 2003, pursuant to the first juvenile court decision, and February 10, 2005 to the date of this opinion, pursuant to the second Court of Appeals decision. Mr. P. was stripped of his rights as a legal parent during those times and cannot be required to pay child support for the time he was not T.K.Y.'s legal parent. Tennessee Code Annotated section 36-1-113(l)(1) provides that although an order terminating parental rights "shall not eliminate the responsibility of such parent . . . for past child support," such an order "shall terminate the responsibilities of that parent . . . for future child support or other future financial responsibilities." (Emphases added.) Thus, the statute unambiguously provides that termination of parental rights terminates the parent's support obligation going forward.
The fact that a termination of rights is later reversed is irrelevant to the question of support, because the parent simply was not the parent during the time rights were terminated; that time cannot be recaptured. Where the parent-child relationship is severed, there can be no duty to support because "the obligation to support the children flows from the existence of the relation of parent and child." Monroe County Children & Youth Servs. v. Werkheiser, 409 Pa.Super. 508, 598 A.2d 313, 315 (1991). The majority of state courts have held that, "absent a statute directing otherwise, an order terminating parental rights severs the parent-child relationship to the degree that the parent no longer owes a duty to support the child." McCabe v. McCabe, 78 P.3d 956, 960 (Okla. 2003); see also Erwin v. Luna, 443 So.2d 1242, 1244 (Ala.Civ.App.1983); County of Ventura v. Gonzales, 88 Cal.App.4th 1120, 106 Cal.Rptr.2d 461, 463 (2001); In re Bruce R., 234 Conn. 194, 662 A.2d 107, 111 (1995); Ponton v. Tabares, 711 So.2d 125, 126 (Fla.Dist.Ct.App.1998); Dep't of Human Res. v. Ammons, 206 Ga.App. 805, 426 S.E.2d 901, 902 (1992); Kansas ex rel. Sec'y of Soc. & Rehab. Servs. v. Clear, 248 Kan. 109, 804 P.2d 961, 966 (1991); Mauk v. Mauk, 873 S.W.2d 213, 215 (Ky.Ct.App. 1994); Louisiana v. Smith, 571 So.2d 746, 748 (La.Ct.App.1990); In re Estate of Braa, 452 N.W.2d 686, 688 (Minn.1990); Schleisman v. Schleisman, 989 S.W.2d 664, 671 (Mo.Ct.App.1999); Nevada v. Vine, 99 Nev. 278, 662 P.2d 295, 297-98 (1983); Gabriel v. Gabriel, 519 N.W.2d 293, 295 (N.D.1994); In re Scheehle, 134 Ohio App.3d 167, 730 N.E.2d 472, 475 (1999); Werkheiser, 598 A.2d at 315; Coffey v. Vasquez, 290 S.C. 348, 350 S.E.2d 396, 398 (Ct.App.1986); Estes v. Albers, 504 N.W.2d 607, 608 (S.D.1993); Swate v. Swate, 72 S.W.3d 763, 771 (Tex.Ct.App. 2002); Virginia ex rel. Spotsylvania County Dep't of Soc. Servs. v. Fletcher, 38 Va. App. 107, 562 S.E.2d 327, 329 (2002); In re Dependency of G.C.B., 73 Wash.App. 708, 870 P.2d 1037, 1042 n. 6 (1994). But see Adoption of Marlene, 443 Mass. 494, 822 N.E.2d 714, 718 (2005); Evink v. Evink, 214 Mich.App. 172, 542 N.W.2d 328, 331 (1995); Rhode Island v. Fritz, 801 A.2d 679, 685 (R.I.2002); Rebecca Lynn C. v. Michael Joseph B., 213 W.Va. 744, 584 S.E.2d 600, 603-04 (2003).
In view of the plain language of section 36-1-113(l)(1) and the well-reasoned decisions from a majority of our sister states, we hold that termination of parental rights also terminates that parent's prospective support obligation. If parental rights are reinstated, as in this case, the support obligation resumes upon the date that rights are reinstated.
In sum, we reverse the juvenile court's order of support to the extent that it requires Mr. P. to pay support during the *355 times that his parental rights were terminated: between March 13, 2002, and September 2, 2003, as well as for the period following the second Court of Appeals opinion, February 10, 2005, through the date of the judgment in this appeal.

B. Further Relief from Child Support Based on Equitable Considerations
We also agree with Mr. P. that he is entitled to equitable relief from a portion of his retroactive child-support obligation. Mr. and Mrs. Y. not only voluntarily supported T.K.Y. from birth, but also actively interfered with Mr. P.'s ability to parent T.K.Y. and vigorously opposed his efforts to legitimate T.K.Y. Under these unique circumstances, as explained below, some relief from retroactive child support is appropriate.
The decision to award retroactive child support lies within the discretion of the juvenile court. State ex rel Coleman v. Clay, 805 S.W.2d 752, 755 (Tenn.1991). However, the trial court's discretion is cabined by the statutory requirement that it must presumptively apply the Child Support Guidelines. Tenn.Code Ann. § 36-5-101(e)(1)(A) (2005). The trial court's discretion is further limited by Tennessee Code Annotated section 36-2-311(a)(11)(A) (2005), which states a presumption that child support "shall be awarded retroactively to the date of the child's birth." See also Child Support Guidelines, Tenn. Comp. R. & Regs. 1240-2-4-.06
Section 36-2-311(a)(11)(A), governing retroactive child-support orders, sets forth only three factors to be considered as a basis for awarding less than full retroactive support: the father's lack of knowledge of the existence of the child; the mother's intentional failure to inform the father of the existence of the child; and the mother's attempts to notify the father of the existence of the child. Tenn.Code Ann. § 36-2-311(a)(11)(A)(i)-(iii). In other words, the statute only contemplates excusing retroactive child support to the date of birth in circumstances where the father was not aware of the existence of the child. Because this is not a case where the father was unaware of the child's existence, the trial court awarded back support to the date of T.K.Y.'s birth.
The statute further provides, however, that the court may consider "the equity between the parties." Tenn.Code Ann. § 36-5-101(e)(1)(A). Although this section, which governs support awards, provides that "the court shall apply, as a rebuttable presumption, the child support guidelines," it also states that,
If the court finds that evidence is sufficient to rebut this presumption, the court shall make a written finding that the application of the child support guidelines would be unjust or inappropriate in that particular case, in order to provide for the best interest of the child or children, or the equity between the parties. Findings that the application of the guidelines would be unjust or inappropriate shall state the amount of support that would have been ordered under the child support guidelines and a justification for the variance from the guidelines.
Id. (emphasis added). In Hoyle v. Wilson, 746 S.W.2d 665 (Tenn.1988) (superseded by statute on other grounds as stated in O'Brien v. Bainbridge, 1992 WL 156036, *2 (Tenn.Ct.App. July 8, 1992)), for example, this Court affirmed the trial court's forgiveness of the father's child-support obligation on equitable grounds. In Hoyle, the mother removed the children from the state and the father was unable to locate them for two years. The father had faithfully paid support up until that time even though the mother had thwarted *356 his attempts at visitation, and he resumed paying support as soon as he was notified of the children's whereabouts. The Court held that "the equities of the case," where the father's failure to pay support was due to the mother's willful violation of the visitation order, supported the trial court's remedy. Id. at 672.
We note that in Hoyle, unlike in this case, the father sought retroactive relief from a child-support order. Three years after Hoyle, the Supreme Court held that a trial court may not grant retroactive relief from a child-support order, even upon equitable grounds, because of a statutory revision making child-support orders final judgments not subject to modification. Rutledge v. Barrett, 802 S.W.2d 604, 606 (Tenn.1991) (citing Tenn.Code Ann. § 36-5-101(a)(5) (1989)). Rutledge limited Hoyle to the extent that a court may not consider equitable defenses to relieve an obligor from a previous child-support order. In this case, however, there was no previous order, so the limits on equitable relief in Rutledge do not apply.
In our view, the unique facts in this case support Mr. P.'s argument that he is entitled to equitable relief from his child-support obligation during the time that Mr. and Mrs. Y. interfered with his ability to parent T.K.Y. We emphasize that this is not a case where the father seeks relief from an existing child-support order, or where the custodial parents violated an existing visitation order. Here, Mr. P. was not adjudicated to be T.K.Y.'s parent until September 2, 2003, over four years after Mr. P. initiated his parentage petition and nearly six years after the birth of the child. Because Mr. P. did not have the benefits or responsibilities flowing from an adjudication of parenthood, or the rights flowing from court-ordered visitation, his ability to form a parental relationship was entirely dependent upon the willingness of Mr. and Mrs. Y. to permit him to do so. They vigorously denied him that opportunity. From the time that Mr. and Mrs. Y. first petitioned for a restraining order, on October 14, 1999, through the date of the juvenile court's first decision on March 13, 2002, Mr. P. was prevented from seeing T.K.Y., first by the threat of a restraining order and then by the actual entry of a restraining order. In addition, Mr. P. was rebuffed in his attempt to send the child a birthday gift after he had filed his petition to establish parentage. In short, we believe that equity demands that Mr. P. be relieved of child-support obligations for this period under the unique facts of this case.
In reaching this conclusion, we emphasize that we do not intend to permit relief from existing child-support orders upon mere allegations that a custodial parent has interfered with visitation. As we observed in Rutledge, "the custodial parent's conduct cannot extinguish the non-custodial parent's legal responsibility. Under well-recognized principles of Tennessee law, the obligation of support and the right of visitation are both intended for the benefit of the child, and the two are not interdependent." 802 S.W.2d at 607. In this case, however, there was no support order; rather, Mr. P. was actively opposed in his efforts to establish paternity and support. Additionally, our holding should not be construed as allowing a parent to reject or waive child-support payments without careful consideration of the interests of the child for whose benefits such payments are made. In this case, for instance, T.K.Y. was supported by Mr. and Mrs. Y., notwithstanding their interference with Mr. P.'s efforts to parent the child. The record does not show that T.K.Y. suffered for lack of support from Mr. P. during the time that Mr. and Mrs. Y. interfered with Mr. P.'s ability to form a *357 relationship with T.K.Y. Although "the purpose of the payment is to fulfill the non-custodial parent's obligation to contribute to the child's support," the actual payment "goes, directly or indirectly, to the custodial parent or guardian of a child." Id. (citation omitted). In this case, it would be inequitable to require Mr. P. to pay retroactive support to Mrs. Y. during the time that she and her husband actively prevented Mr. P. from establishing his paternity and taking responsibility for supporting T.K.Y.
In contrast, we reject Mr. P.'s argument that he should also be relieved of support from the time of the child's birth through the date of the first petition for a restraining order. Although Mr. P. acquiesced in Mrs. Y.'s wishes that he cooperate in keeping the affair and T.K.Y.'s true parentage a secret during that time, and that he not pay support, he appears from the record to have been a willing and equal participant in the arrangement. Equity does not require that he be relieved of support during that time.

C. Other Arguments
Mr. and Mrs. Y. argue that Mr. P. should be required to pay the full amount of T.K.Y.'s prenatal, birthing, postnatal, and medical expenses or, alternatively, that he should be required to reimburse Mr. and Mrs. Y. for the cost of the family insurance premium covering T.K.Y. See Tenn.Code Ann. § 36-2-311(a)(13) (order of parentage shall include "[d]etermination of liability for a mother's reasonable expenses for her pregnancy, confinement and recovery to either or both parties"); see also State ex rel. Coleman, 805 S.W.2d at 755. Because Mr. P. is liable for support from the time of T.K.Y.'s birth until the date of the first petition for restraining order, we agree with Mr. and Mrs. Y. that he must shoulder some share of the expenses incurred in connection with Mrs. Y.'s pregnancy and recovery and with T.K.Y.'s birth. We do not think either of the suggestions offered by Mr. and Mrs. Y. is entirely equitable, however. Requiring Mr. P. to pay the full cost of the family's insurance policy confers an unjust windfall on the Y. family, in that Mr. P. would be paying insurance for not just T.K.Y., but for Mr. and Mrs. Y. and their daughter as wella result clearly not contemplated by the statute. Similarly, requiring Mr. P. to pay the "full amount" of Mrs. Y.'s expenses, without regard to what portion of those expenses were paid by the insurance company, would likewise be a windfall to Mr. and Mrs. Y. We remand this fact-specific decision to the trial court, but observe that it may be most equitable to prorate the cost of the insurance policy and/or order that Mr. P. reimburse the Y.'s for their out-of-pocket expenses incurred in association with T.K.Y.'s prenatal care, birth, and Mrs. Y.'s recovery.
Next, we consider Mr. and Mrs. Y.'s argument that the juvenile court erred in calculating child support by failing to include in-kind income Mr. P. received for house-sitting during 2001, 2002, and 2003. Child support is calculated according to the Child Support Guidelines promulgated by the Department of Human Services. Tenn. Comp. R. & Regs. Ch. 1240-2-4. The guidelines require consideration of in-kind income, listing housing as an example of such in-kind remuneration. The juvenile court therefore erred in omitting the value of the in-kind income Mr. P. received for house-sitting, and the court shall recalculate the support due including the in-kind income as appropriate.
Finally, Mr. and Mrs. Y. argue that an upward deviation from the Child Support Guidelines is appropriate because Mr. P. has not adequately visited the child. We conclude that this argument is also without *358 merit, particularly given the juvenile court's statement that the evidence did not support a finding that Mr. P. willfully failed to visit or support the child.

Conclusion
Mr. P. is undisputedly the biological father of T.K.Y. Having so held, the juvenile court was required by the statutory scheme to declare him the legal father as well. Mr. P. is T.K.Y.'s legal father, and his rights may only be terminated if the statutory criteria for doing so are met. The judgment of the Court of Appeals is reversed, and the juvenile court's child-support order is modified. The case is remanded to the juvenile court for a calculation of child support and retroactive child support consistent with this opinion. Costs of the appeal are taxed to the appellees, Mr. and Mrs. Y., and their sureties, for which execution shall issue if necessary.
NOTES
[1] To protect the anonymity of the minor child, we refer to all parties using only their initials.
[2] At the time of the Jones decision, the statute provided that the grounds for termination in section 36-1-113(g)(9)(A) did not apply to persons who had established parentage prior to the termination hearing. In 2003, the Legislature amended the statute to provide that it did not apply to persons who had established parentage as of the time the petition was filed. See In re D.A.H., 142 S.W.3d 267, 269 (Tenn. 2004). Because this Court held in D.A.H. that the provision could not be applied retroactively, the requirement that parentage be established as of the time the petition is filed is not applicable to this case. See id. at 274.