# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### ASSIGNED ON BRIEFS JUNE 24, 2011

## EVELYN BURNINE v. VICTOR MICHAEL DAUTERIVE

**Direct Appeal from the Juvenile Court for Gibson County**
**No. 9797      Robert W. Newell, Judge**

**No. W2010-02611-COA-R3-JV - Filed July 27, 2011**

This appeal involves an award of retroactive child support. When the child was an infant, the mother lied and told the father that the child had died. Subsequently, custody of the child was transferred back and forth numerous times between the mother and the maternal grandmother. The father's paternity was established when the child was thirteen, and after establishing a relationship with the child, the father sought to be named primary residential parent. The grandmother then petitioned for retroactive child support. Father was named primary residential parent, but the juvenile court ordered the father to pay approximately $40,000 in retroactive child support to the grandmother, finding a certain statute that provides for deviations in retroactive child support to be inapplicable to this situation. We reverse the court's decision and vacate its award of retroactive child support, and remand for further proceedings.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Reversed, Vacated and Remanded**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

G. Michael Casey, Jackson, Tennessee, for the appellant, Victor Michael Dauterive

Evelyn Burnie, Medina, Tennessee, *pro se*

## OPINION

### I. FACTS & PROCEDURAL HISTORY

Victor Michael Dauterive ("Father") and Teresa Burnine ("Mother") had a brief relationship in late 1992, after which Mother discovered that she was pregnant. Mother resided in Jackson, Tennessee, and Father was a resident of New Iberia, Louisiana, but he traveled frequently because he apparently worked on a riverboat.[1] At some point, Mother informed Father that she was pregnant with his child, and she notified him around the time of the child's birth in May of 1993.

When the child ("Daughter") was approximately two to three weeks old, Father came to Jackson to see her on his way to Chicago for work. Shortly thereafter, Mother became angry with Father and told him that he was not Daughter's father. Mother subsequently called Father crying and told him that Daughter had died of Sudden Infant Death Syndrome ("SIDS"). Daughter was in fact alive and well, but Mother and Father did not speak again after she falsely informed him that Daughter died.

When Daughter was eighteen months old, Mother and Daughter moved to Georgia to live with another man. When Daughter was three years old, she was adjudicated deprived by a Georgia court and placed in the custody of the Department of Family and Children Services in Georgia. Mother's mother, Evelyn Burnine ("Grandmother"), then took custody of Daughter and brought her back to Tennessee. Approximately six months later, a consent order was entered which returned custody to Mother after she completed a residential drug and alcohol abuse program. One year later, in 1998, Grandmother was named guardian of Daughter by a Tennessee court. Grandmother petitioned for guardianship to be returned to Mother in 2001, but in September of 2002, Mother was arrested due to drug possession, and Grandmother was again granted custody of Daughter after she and Mother filed a joint petition requesting such.

Around 2004, Daughter expressed a desire to meet Father, so Grandmother went to the local child support services agency in order to obtain help in locating him. However, it took a long time for the agency to locate Father because Grandmother only told them Father's name and that he lived in Louisiana. In April 2005, the child support agency sent a "Child Support Enforcement Transmittal . . . Initial Request" to the State of Louisiana's child support enforcement services agency pursuant to the Uniform Interstate Family Support Act, requesting that the State of Louisiana establish paternity and child support and order the

---

[1] Although Father's precise occupation is not clear from the record, he testified about being offshore for extended periods of time and traveling around the country for his job.

payment of retroactive child support for the periods of time when Grandmother had custody of Daughter between 1998 and 2001, and since the date of the September 2002 custody order.

On February 2, 2007, a Louisiana court entered a Judgment of Paternity decreeing that Father was the biological father of Daughter, who was then thirteen years old. Following a hearing in the Louisiana court, a hearing officer entered findings and recommendations which suggested that Father be ordered to pay child support in the amount of $450 per month effective February 1, 2007. The hearing officer's findings did not mention the term "retroactive child support," and it is not clear from the record whether the issue was considered. The officer's findings simply state, "Defendant advises that the mother of the child told him early on that child was not his child." When no objection to the hearing officer's recommendation was filed, it was adopted as an order of the Louisiana court.

After Father's paternity was established, he began visiting Daughter in Tennessee on a regular basis, and he eventually bought a house in Tennessee after Daughter asked him to come to Tennessee and raise her. In October 2009, when Daughter was sixteen, Father filed a petition in the juvenile court of Gibson County, Tennessee, seeking to be named Daughter's primary residential parent. In February 2010, Grandmother filed a petition requesting that Father be ordered to pay retroactive child support to her for periods preceding the Louisiana court's 2007 order setting Father's child support obligation. In June 2010, Father was awarded custody of Daughter.

On June 29, 2010, the court heard testimony regarding Grandmother's petition for retroactive child support. Father testified that Mother informed him of Daughter's birth in May 1993 and that he visited Daughter when she was two to three weeks old. He testified that Mother later told him that he was not Daughter's father, and that subsequently, Mother called him crying and said that Daughter had died of SIDS. Father testified that he did not come to Tennessee to investigate Daughter's death, and that Mother had told him that she had moved away. Father testified that he simply did not think that he had a daughter during the years that followed his last conversation with Mother.

Mother similarly testified that she informed Father that she was pregnant with his child and notified him that Daughter was born. She explained that she did not have Father's name placed on the child's birth certificate because she was afraid that Father might try to take Daughter away from her. She said that Father had never threatened to take Daughter, but that she was paranoid because of problems she had experienced with her mother and ex-husband trying to take custody of her other daughter. Mother testified about Father visiting Daughter when she was two to three weeks old, and she remembered him looking at the child and stating, "That's my baby." She said that Father also told her during his visit that he would help Mother to raise Daughter and that "he wouldn't be able to have a baby and not

have anything to do with her." She testified that Father mailed her a check shortly after his visit.

Mother further testified that soon after Father left, when Daughter was about four weeks old, Daughter stopped breathing and had to be taken to the hospital. Mother said she informed Father when Daughter was back at home and doing well. However, Mother testified that about two weeks later, she called Father and told him that Daughter passed away due to SIDS. She said that when Father inquired about Daughter's burial, she told him, "Don't worry about anything. We took care of it." Mother said she lied to Father about the baby's death because she was afraid that he would take Daughter away from her and take her to Louisiana. Mother admitted that she also told Father that Daughter was not his child prior to telling him that she had died. Mother said that she had become upset with Father, explaining, "I basically wanted a relationship with him, and he didn't want that." Mother testified that she never contacted Father again after she told him that Daughter had passed away. Mother testified that throughout all of the subsequent court proceedings involving Daughter, if she was asked about Daughter's father, she would say that she did not know where he was or that she thought he might be in Louisiana. She said she never provided anyone with Father's name or his last known address.

Mother testified that Grandmother also knew the identity of Daughter's father. Mother said she told Grandmother that she did not want anything to do with Father, that she did not want Father in Daughter's life, and that she had told Father that Daughter died. She said Grandmother went along with her plans and did not instruct her to tell Father the truth. She also testified that Grandmother never asked her for Father's address or telephone number.

Grandmother similarly testified that she had known who Daughter's father was all along because Mother told her while she was pregnant with Daughter, and Mother had also told her that he lived in New Iberia, Louisiana. In addition, Grandmother testified that she had met Father when he and Mother were dating. Grandmother testified that she had attempted to convince Mother to pursue child support from Father, but that Mother refused because she was afraid that Father would come and take Daughter away from her. She said Mother also told her that she had forgotten Father's telephone number. Grandmother testified that when she initially obtained custody of Daughter in the Georgia court, she did not notify the court about Father "because [Mother] didn't want [her] to." She said that Mother told her that Father would come and take Daughter away. Grandmother testified that she also failed to identify Father during the subsequent custody proceedings in Tennessee courts because Mother asked her not to identify him and told her that Father would take the child away. Grandmother conceded that Father began visiting Daughter regularly and paying child support when his paternity was established in February 2007.

-4-

Daughter was seventeen years old at the time of trial, and she testified as well. She said that when she was seven to eight years old, Mother told her Father's name and told her about telling Father that Daughter passed away. Daughter said she discussed the issue with Grandmother after she went to live with her for a second time, and Grandmother agreed to try to find Father for her. Daughter testified that Father had been an active part of her life since she met him in 2007.

Following the hearing, the juvenile court judge instructed the parties' attorneys to submit memoranda regarding the relevant statutes and the propriety of awarding retroactive child support under the circumstances presented. On August 25, 2010, the court entered an order requiring Father to pay $40,950 in retroactive child support to Grandmother for the periods of time when she had custody of Daughter during her minority prior to the Louisiana court's order setting child support in 2007. Father timely filed a notice of appeal.

## II. ISSUES PRESENTED

Father presents the following issues for review on appeal:

1. Whether the trial court erred in awarding retroactive child support to Grandmother when Father was told by Mother and was under the mistaken but reasonable belief that the child died shortly after the child's birth;
2. Whether the trial court erred in awarding retroactive child support because the Louisiana court had already ruled on the issue.

For the following reasons, we reverse the decision of the juvenile court, vacate its award of retroactive child support, and remand for further proceedings.

## III. DISCUSSION

"In this state, it is a well-settled principle that biological parents must, as a general rule, support their children until they reach the age of majority." ***K.A.G. v. B.L.I.***, No. M2008-02484-COA-R3-JV, 2009 WL 4175861, at *3 (Tenn. Ct. App. E.S. Nov. 25, 2009) (citing Tenn. Code Ann. § 34-1-102(a), (b) (2001); *Smith v. Gore*, 728 S.W.2d 738, 750 (Tenn. 1987)). A parent's obligation to support exists regardless of whether there is a court order and regardless of whether the parents were ever married. *Id.* "When paternity of a child born out of wedlock is established, the trial court is required to address not only the child's need for future support, but also the father's obligation to pay past support." *Id.* (quoting *State ex rel. Hayes v. Carter*, W2005-02136-COA-R3-JV, 2006 WL 2002577 at *2 (Tenn. Ct. App. July 6, 2006)). "The trial court's decision regarding whether to award retroactive child support is reviewed under an abuse of discretion standard." ***State ex rel.***

-5-

*Kennamore v. Thompson*, No. W2009-00034-COA-R3-JV, 2009 WL 2632759, at \*2 (Tenn. Ct. App. Aug. 27, 2009) (citing *State ex rel Coleman v. Clay*, 805 S.W.2d 752, 755 (Tenn. 1991)). However, the trial court must exercise its discretion within the strictures of the Child Support Guidelines and the applicable statutes. **Berryhill v. Rhodes**, 21 S.W.3d 188, 193 (Tenn. 2000). A trial court abuses its discretion when it applies an incorrect legal standard or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining. **Williams v. Baptist Mem'l Hosp.**, 193 S.W.3d 545, 551 (Tenn. 2006) (citing *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)).

The Guidelines provide a presumption that child support will be awarded retroactively to the date of the child's birth in paternity cases. Tenn. Comp. R. & Regs. 1240-2-4-.06(1)(a). However, "[o]ur legislature has recognized that under certain circumstances it would be inequitable to order a father to pay child support retroactive to the child's birth." **Taylor v. Robinson**, No. M2006-00109-COA-R3-JV, 2007 WL 1628862, at \*5 (Tenn. Ct. App. Jun. 5, 2007). Accordingly, Tennessee Code Annotated section 36-2-311(a)(11)(A) provides, in relevant part, that when making an award of retroactive child support,

> . . . the court shall consider the following factors as a basis for deviation from the presumption in the child support guidelines that child and medical support for the benefit of the child shall be awarded retroactively to the date of the child's birth:
> (i) The extent to which the father did not know, and could not have known, of the existence of the child, the birth of the child, his possible parentage of the child or the location of the child;
> (ii) The extent to which the mother intentionally, and without good cause, failed or refused to notify the father of the existence of the child, the birth of the child, the father's possible parentage of the child or the location of the child; and
> (iii) The attempts, if any, by the child's mother or caretaker to notify the father of the mother's pregnancy, or the existence of the child, the father's possible parentage or the location of the child[.]

In addition, when considering the issue of retroactive child support, "the court may consider 'the equity between the parties.'" **In re T.K.Y.**, 205 S.W.3d 343, 355 (Tenn. 2006) (quoting Tenn. Code Ann. § 36-5-101(e)(1)(A)). "In cases in which the presumption of the application of the guidelines is rebutted by clear and convincing evidence, the court shall deviate from the child support guidelines to reduce, in whole or in part, any retroactive support." Tenn. Code Ann. § 36-2-311(a)(11)(B). In such cases, the court must make a written finding "that application of the guidelines would be unjust or inappropriate in order to provide for the best interests of the child or the equity between the parties." **Id.**

In *In re T.K.Y.*, 205 S.W.3d 343, 355-57 (Tenn. 2006), our Supreme Court found that a father was entitled to equitable relief from a portion of his retroactive child support obligation where the mother and her then-husband voluntarily supported the child and also vigorously opposed the father's efforts to legitimate the child by seeking a restraining order and filing a petition to terminate his parental rights. The Court explained that it is appropriate to consider "the equity between the parties" when considering the issue of retroactive child support. *Id.* at 355 (citing Tenn. Code Ann. § 36-5-101(e)(1)(A)). It also cited a previous case in which it had granted equitable relief from a father's retroactive child support obligation where the mother had removed the children from the state and the father was unable to locate them. *Id.* (citing *Hoyle v. Wilson*, 746 S.W.2d 665 (Tenn. 1988) (superseded by statute on other grounds)). In sum, the Court decided that "it would be inequitable to require [the father] to pay retroactive support to [the mother] during the time that she and her husband actively prevented [the father] from establishing his paternity and taking responsibility for supporting [the child]." *Id.* at 357. However, the Court rejected the father's argument that he should also be relieved from his child support obligation during the period prior to his effort to legitimate the child, when he acquiesced in the mother's wishes to keep their affair and the child's true parentage a secret, stating that equity did not demand relief for the period of time when he was a "willing and equal participant in the arrangement." *Id.*

Similarly, in *State ex rel. Kennamore v. Thompson*, No. W2009-00034-COA-R3-JV, 2009 WL 2632759, at *5 (Tenn. Ct. App. Aug. 27, 2009), this Court affirmed a trial court's decision to award retroactive child support only to the date of a mother's petition to establish paternity, rather than to the birth of the child, where the mother held the child out as her husband's child until after her divorce, and the father had no basis, other than the fact of his liaison(s) with the mother, from which to conclude that he was the father of her child, as he believed that he was sterile.

In another case, *Taylor v. Robinson*, No. M2006-00109-COA-R3-JV, 2007 WL 1628862, at *5 (Tenn. Ct. App. Jun. 5, 2007), the Court affirmed a trial court's decision to award retroactive support only to the date of the mother's paternity petition where she never clearly notified the father of her pregnancy or specifically told him that she believed him to be the child's father, as the mother herself was unsure of his parentage. The Court found that the mother simply "did not want Father to enjoy the benefits of fatherhood," as there was uncontradicted evidence that she waited until the child was twelve years old before filing her petition because she thought that the child could then testify that he did not want to see the father, yet the father would still have to pay child support. *Id.* at *7. The Court stated that "[b]ecause of [Mother's] conduct, Father did not have the opportunity to bond with his son and establish a relationship with him." It then concluded that it would be inequitable to reward Mother for such conduct with an award of retroactive child support. *Id.*

In the case before us, the trial court considered the applicability of Tennessee Code Annotated section 36-2-311(a)(11)(A), which, as stated above, governs retroactive child support orders[2] and provides, in relevant part:

> . . . the court shall consider the following factors as a basis for deviation from the presumption in the child support guidelines that child and medical support for the benefit of the child shall be awarded retroactively to the date of the child's birth:
> (i) The extent to which the father did not know, and could not have known, of the existence of the child, the birth of the child, his possible parentage of the child or the location of the child;
> (ii) The extent to which the mother intentionally, and without good cause, failed or refused to notify the father of the existence of the child, the birth of the child, the father's possible parentage of the child or the location of the child; and
> (iii) The attempts, if any, by the child's mother or caretaker to notify the father of the mother's pregnancy, or the existence of the child, the father's possible parentage or the location of the child[.]

In discussing the applicability of the statute, the trial court framed the issue as whether Father was entitled to protection under the statute due to Mother's lie, where he already had knowledge of his child's "existence" in Tennessee. The court concluded, in its final order, that "[t]his statute only contemplates excusing retroactive child support back to the birth of the child in circumstances where a father was told by the mother that the child did not exist or that the child was not his child." The court concluded that the "main purpose" of the statute is "to protect fathers who have never had knowledge of their children." The court went on to find that Father clearly knew about the "existence" of Daughter because he visited her right after she was born. The court did acknowledge that Mother's "inappropriate conduct . . . contributed to the father's . . . failure to be involved in the child's life," but it stated that Father also had a "duty" to come to Tennessee to "check out the misleading allegation of the mother" regarding Daughter's death. The court also stated that there was a "strong inference in the record that contact may have been made with the father" by a child support agency in 2004, and that Father "must have realized" that Daughter was alive at that

---

[2] We recognize that section 36-2-311 provides these factors for consideration when a court makes a retroactive child support award in the context of entering an order of parentage. In this case, the trial court was not entering an order of parentage because the Louisiana court had already done so. Nevertheless, we find no error in the court's consideration of these factors, as our Supreme Court has described section 36-2-311(a)(11)(A) as "governing retroactive child-support orders," *see In re T.K.Y.*, 205 S.W.3d at 355, and in any event, the trial court was expressly authorized to consider the "equity between the parties." *See id.*

time. In sum, the trial court concluded that the factors in Tennessee Code Annotated section 36-2-311(a)(11)(A) were inapplicable to this case, and consequently, it ordered that retroactive child support should be awarded from the date of the child's birth until Father began paying child support pursuant to the 2007 Louisiana order. Because Grandmother had custody of Daughter for much of that time, she was awarded child support totaling $40,950.

After carefully reviewing the entire record and the applicable law, we respectfully disagree with the trial court's conclusion that a deviation was inappropriate in this case. Tennessee Code Annotated section 36-2-311(a)(11)(A) instructs courts to consider the extent to which the father did not know of, and whether the mother or caretaker intentionally withheld information regarding, "the existence of the child, the birth of the child, his possible parentage of the child *or* the location of the child."[3] (emphasis added). Admittedly, Father was aware of Daughter's existence, in addition to her birth and location, when he visited her in 1993, but due to the uncontradicted evidence that Mother told Father that Daughter died shortly thereafter, he was unaware of Daughter's existence or location in the years that followed. Moreover, Tennessee Code Annotated section 36-5-101(e)(1)(A) allows the court to consider "the equity between the parties" even where the factors described in section 36-2-311(a)(11)(A) do not apply. *Kennamore*, 2009 WL 2632759, at *5. Thus, the trial court erred in its apparent conclusion that it was only authorized to deviate from the guidelines in a situation in which a father had *never* known of the existence of his child.

Here, a consideration of the aforementioned factors and the "equity between the parties" leads us to conclude that it would be inequitable to require Father to pay retroactive child support when the conduct of Mother, and Grandmother, prevented Father from

---

[3] The trial court's interpretation of the statute may be due to the following excerpt from *In re T.K.Y.*, wherein the Court summarized the statute as follows:

> Section 36-2-311(a)(11)(A), governing retroactive child-support orders, sets forth only three factors to be considered as a basis for awarding less than full retroactive support: the father's lack of knowledge of the existence of the child; the mother's intentional failure to inform the father of the existence of the child; and the mother's attempts to notify the father of the existence of the child. Tenn. Code Ann. § 36-2-311(a)(11)(A)(i)-(iii). In other words, the statute only contemplates excusing retroactive child support to the date of birth in circumstances where the father was not aware of the existence of the child. Because this is not a case where the father was unaware of the child's existence, the trial court awarded back support to the date of T.K.Y.'s birth.

The statute, by its terms, however, instructs the court to consider the extent of the father's knowledge, and the mother's failure or attempts to notify him, of "the existence of the child, the birth of the child, his possible parentage of the child *or* the location of the child." Tenn. Code Ann. § 36-2-311(a)(11)(A) (emphasis added).

knowing of Daughter's existence or taking responsibility for supporting her. Father had told Mother during his first visit with Daughter that he intended to help raise her, as he could not simply have a child "and not have anything to do with her." Due to her fear that Father would take Daughter to Louisiana, Mother then decided to tell Father that Daughter died. We disagree with the trial court's suggestion that Father should have traveled from Louisiana to Tennessee to investigate Mother's story. Mother called him crying, after the child had recently been hospitalized for a breathing problem, and told Father the child had died of SIDS. When Father asked about the burial, Mother told him, "Don't worry about anything. We took care of it." She also told him that she had moved, so Father no longer knew where she lived.

After thoroughly searching the record, we are also unable to find any support for the trial court's statement that there is a "strong inference in the record" that the child support agency made contact with Father in September 2004 such that he "must have realized" Daughter was alive at that time.

Although Grandmother was never asked at trial whether she knew about Mother's lies, both Mother and Father testified that Grandmother did know.[4] Mother testified that she told Grandmother about the lie and the fact that she did not want Father in Daughter's life. According to Mother, Grandmother simply went along with her plans. Grandmother admitted that throughout the numerous court proceedings involving Daughter, she did not inform anyone about Father because Mother "asked [her] not to" and told her that Father would come and take Daughter. Clearly, Mother and Grandmother knew that Father would have tried to establish a relationship with Daughter or seek custody of her had he been aware of her existence or location. Mother and Grandmother purposefully chose not to give Father that opportunity. Moreover, we note that the child, now no longer a minor, has been in Father's custody since June 2010. Child support is, of course, intended to benefit the child, not to reward or punish a parent. In this case, because the child is no longer living with Grandmother, an award of retroactive child support from Father to Grandmother would not benefit the child, and in fact would deprive Father of resources that could be used for the child. Under all of these circumstances, an award of retroactive child support would be inequitable.

---

[4] We note that Grandmother submitted a *pro se* brief on appeal in which she attempts to present numerous facts which were not presented in her trial testimony, and which, in some cases, directly contradict her own testimony and that of the other witnesses. However, the law is clear that statements of fact made in briefs are not evidence and may not be considered by an appellate court unless they are properly made part of the record. *Threadgill v. Bd. of Prof'l Responsibility of Supreme Court*, 299 S.W.3d 792, 812 (Tenn. 2009).

Considering the extent to which Father did not know, and could not have known, of the existence and location of Daughter, *see* Tenn. Code Ann. § 36-2-311(a)(11)(A)(i), the extent to which Mother and Grandmother intentionally, and without good cause, failed or refused to notify Father of Daughter's existence and location, *see* Tenn. Code Ann. § 36-2-311(a)(11)(A)(ii)-(iii), and "the equity between the parties," *see* Tenn. Code Ann. § 36-5-101(e)(1)(A), we find clear and convincing evidence to rebut the presumption in the guidelines that child support should be awarded retroactive to the date of Daughter's birth. In our opinion, application of the guidelines would be unjust and inappropriate in order to provide for the equity between the parties. *See id.* Thus, we vacate the trial court's award of retroactive child support for the periods preceding the Louisiana court's establishment of Father's child support obligation in 2007. Father's second issue regarding the preclusive effect of the Louisiana order is pretermitted.

Father has requested an award of attorney's fees on appeal, which, exercising our discretion, we respectfully deny. Father also requested that this Court award him a judgment against Grandmother for all funds paid to her for retroactive child support pursuant to the trial court's order pending this appeal. Because we have vacated the trial court's award of such support, we find that reimbursement is appropriate, and the trial court should consider the amount due to Father on remand.

## IV. CONCLUSION

For the aforementioned reasons, we reverse the decision of the juvenile court, vacate its order of retroactive child support, and remand for further proceedings. Costs of this appeal are taxed to the appellee, Evelyn Burnine, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.

-11-