IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 11, 2007 Session

**CHRISTY L. TAYLOR v. RANDALL ROBINSON, JR.**

**Appeal from the Juvenile Court for Rutherford County**
**No. 3815C     Donna Scott, Judge**

---

**No. M2006-00109-COA-R3-JV - Filed on June 5, 2007**

---

The mother of a twelve year old boy filed a petition to establish the paternity of the child. A DNA test confirmed that the man named in the petition was indeed the biological father, and he agreed to pay temporary child support during the pendency of the case. The mother asked the court to order the father to pay retroactive child support back to the date of the child's birth, in accordance with the child support guidelines. After a hearing, the trial court decided that a deviation from the guidelines was warranted because of the mother's failure to inform the father of his possible paternity prior to filing the legitimation petition. The court accordingly ordered that retroactive support be paid only from the date of the filing of the petition. We affirm the trial court, but remand this case so the court can state in its order the "the total amount of retroactive support that would have been paid retroactively to the birth of the child, had a deviation not been made by the court," as is required by Tenn. Code Ann. § 36-2-311(a)(11)(F).

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., J., and J. S. DANIEL, SR. J., joined.

Donald M. Bulloch, Jr., Murfreesboro, Tennessee, for the appellant, Christy L. Taylor.

Terry A. Fann, Murfreesboro, Tennessee, for the appellee, Randall Robinson, Jr.

**OPINION**

**I. BACKGROUND**

The child at the center of these proceedings, Zachary Lee Taylor, was born on October 10, 1991. His mother, Christy Taylor ("Mother") identified two men with whom she had been intimate at around the time that Zachary was conceived, the appellee, Randall Robinson, Jr., and David

Holbrook, who was briefly her fiancé.[1] The proof indicates that Mr. Robinson knew that Ms. Taylor had become pregnant, but the parties dispute the extent of his awareness, both before and after the child's birth, that he might be the father.

Ms. Taylor testified that when she found out she was pregnant, she did not tell her gynecologist or her obstetrician whom she believed to be the father. She did not list Mr. Robinson as the child's father on her application for TennCare, and she did not tell the hospital to place his name on the birth certificate. Ms. Taylor and Mr. Robinson and their respective families all lived in Murfreesboro and had known one another for many years, but the proof shows that over the next twelve years there was very little contact between them, most of which was through a few telephone calls. Because the proper resolution of this case turns largely on Mr. Robinson's knowledge of the possibility that he was Zachary's father, we will later discuss in detail the testimony as to the nature of those phone calls.

In 1993, Ms. Taylor married Michael Boyle. Mr. Boyle testified that his wife never told him the identity of Zachary's father and that he was led to believe that she did not know. One child, a boy named Brandon, was born of the marriage. Mr. Boyle had a steady job with Bridgestone and provided for both children during the course of the marriage. In 1997, Mr. Boyle and Ms. Taylor divorced. Shortly after her divorce from Mr. Boyle, Ms. Taylor married a man named David Robinson, who was also apparently a good provider. That marriage lasted until 2003 and also ended in divorce.

## II. Legal Proceedings

On December 2, 2003, about eight months after her divorce from David Robinson, Mother filed a Petition in the Juvenile Court of Rutherford County to establish Zachary's paternity. The petition named Randall Robinson as the defendant and explicitly alleged for the first time that he was her child's natural and biological father. Mr. Robinson agreed to undergo DNA testing. A resulting Parentage Test Report found a probability of greater than 99.99% that Randall Robinson was Zachary's father. Hereinafter in this opinion, we will sometimes refer to Mr. Robinson as "Father."

Father subsequently admitted parentage and agreed to pay Mother temporary child support of $400 per month, pending a final support hearing. Father had married in 1995, and he and his wife had two young daughters. He added coverage for Zachary to the family medical insurance policy provided through his job.

Father provided Mother with his past income tax returns in response to a request in the legitimation petition. Mother used those returns to prepare a child support worksheet, which set out her claim for retroactive child support dating from Zachary's birth. The total claim for support

---

[1]The proof shows that Mr. Robinson and Ms. Taylor stopped dating shortly after she conceived, and that Ms. Taylor and Mr. Holbrook never married.

amounted to $56,995. The claim for Zachary's medical, dental, orthodontic and educational expenses as well as for attorney fees amounted to an additional $16,054.

The trial of this case was conducted over two days, beginning on August 17, 2004, and resuming on August 24, 2005.[2] Testifying witnesses aside from Mother and Father were Jackie Mullinax Marshall, who had dated Father around the same time that Mother became pregnant with Zachary, Michael Boyle, Michael Boyle's current wife Lisa, Father's current wife, also named Lisa, and Father's mother, Jane Manley.

Ms. Marshall testified that after she returned from a high school senior trip to Florida with Father and his parents, Mother called her and told her she was pregnant and wanted to get in touch with Father. Ms. Marshall said that she relayed that information to Father, who responded by saying that he didn't think the child was his, since he knew Mother had been sexually involved with others.[3]

Mother testified that after several attempts she reached Mr. Robinson by telephone and told him she was pregnant. She also testified that she told Mr. Holbrook about her pregnancy. Father allegedly responded to her announcement by saying that he could not take the responsibility because he had other things going on in his life. When Father took the stand, however, he denied that Mother ever called him during her pregnancy, and he also denied Mother had ever spoken to him about it. He admitted, however, that he heard from someone around that time that Mother was pregnant.

The next phone call testified to allegedly occurred in 1994. Mother, who was still married to Michael Boyle at the time, testified that she called Father to ask him what he would think about the possibility of Mr. Boyle adopting Zachary. She testified that Father said that Michael was a good man. Father denied that this phone call had ever occurred.

By 1998 Mother had re-married, and she again called Father to talk about adoption, asking if he would be willing to sign adoption papers. He said yes. In 1999, Mother called again and reached Lisa Robinson, Father's wife. Mother said that Zachary had a learning disability and had been complaining of chest pains, and that she wanted to learn about Father's medical history.[4] Lisa Robinson gave her the information she asked for.

---

[2]There was an interval of over one year between the two days during which the trial of this case was conducted. The lengthy delay apparently resulted in large part from an extended illness suffered by the judge. The first day's testimony was transcribed, and the judge thus had the opportunity to review it a few days before the second hearing day.

[3]In her own testimony, Mother indicated that she believed Ms. Marshall to be an untruthful person. She thus impeached her own witness.

[4]It is unclear whether Mother also called Mr. Holbrook or anyone else for medical information.

Mother strongly testified that she never had any real doubt that Mr. Robinson was Zachary's father, stating that "I somewhat knew the night that I conceived," and that "You just know. A woman would know." Despite the implication of near certainty, the testimony of others indicated that she must have harbored some doubt.

For example, Lisa Boyles testified that she spoke to Mother both before and after the petition was filed and that "her statements have always been the same, that there could only have been two fathers, David Holbrook and Randall Robinson." Lisa Robinson testified that during the 1999 phone call she asked Mother, "if you think Randall is possibly the father of your child, why haven't you pursued this?" Mother responded, "Randall is not the only person I slept with." After Father's paternity was confirmed, Lisa Robinson called Mother to figure out insurance for Zachary, and Mother reportedly said that after she got the DNA results, she called David Holbrook and told him, "hey man, you ought to be happy, you're off the hook."

Even if, as Mother implied, she was nearly certain that Randall Robinson was Zachary's father, that would naturally raise the question as to why it took her so long to try to establish his paternity. Mother testified that she did not think Mr. Robinson would make a good father because he smoked marijuana and had received several citations for D.U.I. Lisa Robinson's testimony sheds light on Mother's other possible motives.

> She told me different things at different times. In our first conversation after the DNA results were in, she said the only reason that she had filed this was because she could not get Zachary on TennCare and needed to get insurance for him.

> But later she also told me that she had been researching this case for years, and she could wait as long as she wanted to because once Zachary turned 12, he could say he didn't want to see his father and Randall would still have to pay or his father would still have to pay.

Aside from Mother's alleged knowledge of Zachary's true paternity, another important question has to do with what Father knew or believed. There was no testimony by Mother or by anyone else that she ever actually told Father she believed that he was Zachary's father, but some of the conversations she testified to, such as those involving adoption and medical history, clearly carry that implication.

Mother's testimony about an encounter with Jane Manley, Father's mother, was also full of implication, but was controverted by Ms. Manley's own testimony. Ms. Manley had worked in a Murfreesboro bank for thirty-seven years. Ms. Taylor worked in the same bank for several of those years prior to Zachary's birth. Mother testified that when Zachary was three months old, she brought him to the bank, and that Jane Manley took the baby out of her hands without asking. However, Ms. Manley testified that it was not uncommon for former employees of the bank to come back to show their babies to co-workers, but she did not specifically recall any such visit by Mother and Zachary. Mother testified that at some point she gave Ms. Manley pictures of Zachary. Ms. Manley adamantly

-4-

denied ever receiving any such pictures. Ms. Manley also testified that prior to her filing of the parentage action, Mother never told her that Zachary was her grandson.

At the conclusion of the proof, the trial court took the matter under advisement. Two months later, the court announced its decision. The court cited Tenn. Code Ann. § 36-2-311 of the paternity statutes, which sets out factors which can be used by the court as a basis for deviation from the presumption in the child support guidelines that child support and medical support for the child's benefit should be awarded retroactively to the date of the child's birth.

The court then recited the following findings of fact, which it stated that it had found by clear and convincing evidence:

> Ms. Taylor did not list Randall Robinson as the Father when she filed for TennCare nor did she put his name on the birth certificate, thereby not notifying Mr. Robinson or the State of Tennessee he was the biological father of this child.
>
> Ms. Taylor was sexually active with other men at the time the child was conceived.
>
> Ms. Taylor was aware and had knowledge of Mr. Robinson's address, residence and had known Mr. Robinson's mother since 1987 and failed to notify or declare to her the child was Mr. Robinson's.
>
> Ms. Taylor had a conversation with Mr. Robinson in 1994 and 1998 regarding adoption, but Mr. Robinson never heard from her again. Mr. Robinson did not believe this child was his.
>
> There was no clear declaration by the mother that she had informed the father of the possible parentage.
>
> The mother did not clearly notify the father of her pregnancy and never admitted to him that he was the father.

In light of those findings, the court concluded that applying retroactive support back to Zachary's birth would be unjust and inappropriate and not in the child's best interest. The court accordingly ordered that child support be only made retroactive to the filing of the legitimation petition on December 2, 2003. A judgment was rendered for the difference between Father's prior support payments made during the pendency of this action and the proper amount calculated on the basis of Father's income. Prospective support in accordance with the child support guidelines was also ordered in the amount of $548 per month. This appeal followed.

### III. RETROACTIVE CHILD SUPPORT

When a court is called upon to establish the parentage of a child, it must enter an order declaring the father of the child and also determining and setting support for the child. Tenn. Code Ann. § 36-2-311(a). In addition to setting prospective support, the court must determine whether to make a award of retroactive support and in what amount. Tenn. Code Ann. § 36-2-311(a)(11). Tenn. Code Ann. § 36-5-101(e) requires a court that is determining the correct amount of child support to apply the Child Support Guidelines as a rebuttable presumption. The guidelines, in turn, declare that when making an initial award of child support, the court is required to establish not only prospective support, but also to determine retroactive support from the child's date of birth, the date of the parties' separation, or the date of abandonment, depending on the circumstances of the case. Tenn. Comp. R. & Regs. 1240-2-4-.04(1)(e).

Our legislature has recognized that under certain circumstances it would be inequitable to order a father to pay child support retroactive to the child's birth. It accordingly enacted an amendment to Tenn. Code Ann. § 36-2-311(a)[5] that reads in relevant part,

(11)(A) Determination of child support pursuant to Chapter 5 of this title. When making retroactive support orders pursuant to the child support guidelines established pursuant to this subsection (a), the court shall consider the following factors as a basis for deviation from the presumption in the child support guidelines that child and medical support for the benefit of the child shall be awarded retroactively to the date of the child's birth:

(i) The extent to which the father did not know, and could not have known, of the existence of the child, the birth of the child, his possible parentage of the child or the location of the child;
(ii) The extent to which the mother intentionally, and without good cause, failed or refused to notify the father of the existence of the child, the birth of the child, the father's possible parentage of the child or the location of the child; and
(iii) The attempts, if any, by the child's mother or caretaker to notify the father of the mother's pregnancy, or the existence of the child, the father's possible parentage or the location of the child.

(B) In cases in which the presumption of the application of the guidelines is rebutted by clear and convincing evidence, the court shall deviate from the child support guidelines to reduce, in whole or in part, any retroactive support. The court must make a written finding that application of the guidelines would be unjust or inappropriate in order to provide for the best interests of the child or the equity between the parties.

---

[5]2003 Tenn. Pub. Acts, ch. 361, § 1. This amendment is applicable to cases, like the one before us, filed after June 17, 2003.

The Tennessee Supreme Court recently interpreted this statute and stated:

Section 36-2-311(a)(11)(A), governing retroactive child-support orders, sets forth only three factors to be considered as a basis for awarding less than full retroactive support: the father's lack of knowledge of the existence of the child; the mother's intentional failure to inform the father of the existence of the child; and the mother's attempts to notify the father of the existence of the child. Tenn. Code Ann. § 36-2-311(a)(11)(A)(i)-(iii). In other words, the statute only contemplates excusing retroactive child support to the date of birth in circumstances where the father was not aware of the existence of the child. . . .

The statute further provides, however, that the court may consider "the equity between the parties." Tenn. Code Ann. § 36-5-101(e)(1)(A).

*In re T.K.Y.*, 205 S.W.3d 343, 355 (Tenn. 2006). The statute quoted and cited by the Court applies to child support orders generally. In pertinent part, it requires that when a court finds "evidence that is sufficient" to rebut the presumption that the amount of support should be the amount resulting from application of the guidelines formula, then the court must make a written finding that "the application of the child support guidelines would be **unjust or inappropriate** in that particular case, in order to provide for the best interest of the child or children, **or the equity between the parties**." Tenn. Code Ann. § 36-5-101(e)(1)(A) (emphasis added). This language, of course, is almost identical to that in Tenn. Code Ann. § 36-2-311(a), quoted above, that applies to an initial support award when paternity is established.

In *In re T.K.Y.*, the Court held that this "equity between the parties" language gives trial courts discretion to deviate from the guidelines when setting retroactive support for reasons other than, or in addition to, the fact situations spelled out in Tenn. Code Ann. § 36-2-311(a)(11)(A), *i.e.*, where the father does not know of the child's existence. *In re T.K.Y.,* 205 S.W.3d at 355. Rather, the trial court can make use of the authority granted by Tenn. Code Ann. § 36-5-101(e)(1)(A) to deviate from the guidelines and reduce retroactive child support "in order to provide for . . . the equity between the parties." Thus, the statute allows the court to consider the equities between the parties even where the factors described in Tenn. Code Ann. § 36-2-311(a)(11)(A) do not apply. *See also State ex rel. Irwin v. Mabalot,* M2004-00614-COA-R3-CV, 2005 WL 3416293, at *6 (Tenn. Ct. App. 2005)(No 11 Tenn. R. App. P. application filed).

In *In re T.K.Y.*, the Supreme Court found that the equities between the parties required it to suspend the child support obligation during the period when the biological father was denied access to the child:

[the biological father] did not have the benefits or responsibilities flowing from an adjudication of parenthood, or the rights flowing from court-ordered visitation, his ability to form a parental relationship was entirely dependent upon the willingness

of [the custodial parents] to permit him to do so. They vigorously denied him that opportunity.

*In re T.K.Y.*, 205 S.W.3d at 356.

In the case before us, Mother claims that the facts of this case do not satisfy the plain terms of the statutory factors set out in Tenn. Code Ann. § 36-2-311(a)(11)(A). She notes that, by his own admission, Father knew that she was pregnant, and she contends that he had to at least suspect that he was Zachary's father. She further argues that as she remained in Murfreesboro and did not keep her address a secret, Father cannot claim that she kept the child's location from him.

It appears to us, however, that the statute places duties on both parents in regard to notification and acknowledgment of parentage.[6] In this case, the alleged attempts by Mother to alert Father as to his possible parentage were equivocal at best, and require us to consider her conduct in light of factors (ii) and (iii) of the statute, as set out above. As the trial court found, she never clearly notified Mr. Robinson of her pregnancy or specifically told him that she believed him to be Zachary's father. She made a few phone calls to ask questions that hinted that she thought he might be the father, but she never followed up on those phone calls in any way. The evidence suggests that she herself was unsure of the identity of Zachary's father and also that she did not want Father to enjoy the benefits of fatherhood so long as she could provide for the needs of the child without having to acknowledge a role for him.

With the advent of DNA testing and the statutory role that such testing plays in paternity proceedings, questions of paternity can now be quickly and accurately resolved through the courts. As Father notes, Mother had access to legal counsel over seven years because of divorce proceedings she was involved in, and she knew how to locate him. However, for reasons of her own she chose not to take any steps that would have established a legal relationship between the child and his father.

Mother attempts to excuse her own inaction by arguing that Father had the same right to file a parentage petition as she did. *See* Tenn. Code Ann. § 36-2-305(b)(1). She contends that his corresponding duty to file such a petition and establish Zachary's true parentage was equal to hers, at least after her phone calls of 1998 and 1999 alerted him to the probability that he was indeed the child's father.

Although Mother's phone calls implied that she believed Mr. Robinson to be the father, there was no information conveyed in those calls to substantiate that belief. The trial court found that Mr. Robinson did not believe he was the father, and he testified that he thought Mother's purpose in calling him was to disrupt his relationship with his wife. While both parties had the right to file a

---

[6]Tenn. Code Ann. § 36-2-311(a)(11)(C) protects the child's right to support in situations where violence, intimidation or the possibility of neglect might deter mothers from taking affirmative steps to establish contact with the child's father, by declaring that deviations from the guidelines will not be granted in such situations. *See State ex rel. Smith v. Via*, E2004-02985-COA-R3-CV, 2006 WL 1719853, at *4-5 (Tenn. Ct. App., June 23, 2006)(No rule 11 Tenn. R. App. P. application filed). Of course, this case does not present any such situation.

parentage action, we cannot conclude based on the facts of this case that Father had a greater obligation than Mother since she never specifically told him she thought he was the child's father.

In any event, the equities between the parties can be considered, regardless of whether Father had reason to believe the child was his. In this case, as in *In re T.K.Y.*, the trial court was obligated to analyze the equities between the parents to determine whether a deviation from the guidelines was warranted.

The proof showed that Father's failure to pay child support during the first twelve years of Zachary's life was primarily due to Mother's failure to file a Petition to determine who the child's father actually was. Because of her conduct, Father did not have the opportunity to bond with his son and establish a relationship with him. Mother had access to legal counsel for seven of those years, and there was no evidence that Father did anything to intimidate her or prevent her from exercising her rights.

Further, there was uncontradicted testimony that Mother said she delayed filing "because once Zachary turned 12, he could say he didn't want to see his father and Randall would still have to pay or his father would still have to pay." Thus, Mother purposely shaped her conduct to prevent the formation of a father-son relationship between Zachary and his father. It would be inequitable to reward her for such conduct.

The proof further showed that during the first twelve years of his life, Zachary was supported by the income provided by Mother's two ex-husbands. Both men had good jobs, and there was no evidence that Zachary ever suffered from lack of material support during that period of time. Mother did not file her petition until she and her second husband divorced and she was single once again. After the petition was filed, Father cooperated fully. He underwent DNA testing, and as soon as his parentage was established he began paying child support. He also acted promptly to provide medical insurance for Zachary.

The proof shows that Father is married and works in construction. Aside from supporting his wife and two daughters, he is now paying prospective child support for Zachary's benefit in the amount of $548 per month. His most recent income tax returns show gross taxable income of $40,847 in 2004 and $37,301 in 2003, with lesser income in prior years. Under all the circumstances discussed above, we agree with the trial court's determination that it would be inequitable to require him to pay retroactive child support to make up for the twelve years during which Ms. Taylor made no attempt to establish his paternity and thus his obligation of support. We therefore affirm the trial court.

## IV. STATUTORY REQUIREMENTS

Our legislature has established some formal requirements for the trial court to follow if it determines that the circumstances of the case justify a deviation from the application of the child support guidelines:

-9-

> In making any deviations from awarding retroactive support, the court shall make written findings of fact and conclusions of law to support the basis for the deviation, and shall include in the order the total amount of retroactive support that would have been paid retroactively to the birth of the child, had a deviation not been made by the court.

Tenn. Code Ann. § 36-2-311(a)(11)(F).

The final order in the present case contains written findings of fact. The letter opinion that is incorporated into the order correctly cites the statutory factors for deviation from the guidelines. Both documents conclude that "applying retroactive support back to the birth of the child would be unjust and inappropriate and not in the best interest of the child." Neither document, however, sets out the amount of support that would have been paid had the court not decided to deviate from the guidelines. Since there is ample financial information in the record from which to make the calculation, it should not be a difficult matter for the court to modify its order by adding the missing figure.

## V.

The order of the trial court is affirmed. We remand this case to the Juvenile Court of Rutherford County for any further proceedings necessary, including the addition of information to its order as to the "the total amount of retroactive support that would have been paid retroactively to the birth of the child, had a deviation not been made by the court," as is required by Tenn. Code Ann. § 36-2-311(a)(11)(F). Costs of this appeal are taxed against Appellant, Christy L. Taylor.

_____
PATRICIA J. COTTRELL, JUDGE