# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs October 13, 2014

## IN RE E.L.R.

**Appeal from the Chancery Court for Loudon County**
**No. 12053      Frank V. Williams, III, Chancellor**

_____

**No. E2014-00394-COA-R3-PT-FILED-DECEMBER 1, 2014**

_____

S.R. (Mother) and D.M.S. (Father) challenge the order (1) terminating their parental rights with respect to their minor son, E.L.R. (the Child) and (2) approving the adoption of the Child by his legal custodian and maternal grandmother, E.W. (Grandmother) and her husband, T.C.W. Jr. (T.W.) (collectively, Grandparents). After a trial, the court found, by clear and convincing evidence, that (1) grounds for termination exist as to both Mother and Father and (2) termination is in the best interest of the Child. The court further found, also by clear and convincing evidence, that the adoption of the Child by Grandparents is in the Child's best interest. Mother and Father appeal. They contest the finding of grounds for termination as well as the trial court's best interest determination. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Ian McCabe, Maryville, Tennessee, for the appellant, S.R.

Andrew Beamer, Knoxville, Tennessee, for the appellant, D.M.S.

Loren E. Plemmons, Loudon, Tennessee, for the appellee, E.W. and T.W.

Julia Spannaus, Maryville, Tennessee, Guardian ad litem, for the Child.

## OPINION

### I.

On September 4, 2012, Grandparents filed a petition to adopt the Child. It included a request that Mother's and Father's parental rights be terminated. The petition named Father as the Child's alleged father. Trial on the petition was held on December 20, 2013. At the outset, Father stipulated, based on the results of DNA testing, that he is the Child's biological father. At the time of trial, the Child was six. He had been in Grandmother's custody for more than five years.

The Child was born to Mother in October 2007. At the time of the Child's birth, Mother was unmarried. In March 2008, Mother left Grandmother's house with the Child, then four months old. Mother was gone for a month before her family tracked her down. Grandmother received a tip that Mother was staying in Knoxville at a house off Western Avenue. The tip came from a man who said he had gone to that location to buy crack cocaine. The man said he had seen Mother, but not the baby. Grandmother; the Child's maternal great-grandmother (M.S.K.); and Mother's younger sister (N.N.), went directly to the house and found Mother and the Child. According to Grandmother, the Child was in "pretty bad shape." He had no clothes on, had "blisters all over his bottom," and "needed attention." By Mother's account, she was not living in a "crack house," but with a friend as a live-in babysitter. Mother said Grandmother and M.S.K. arrived carrying guns and accused her of child neglect. According to Mother, the Child's clothes were in the washer and she had plenty of formula and supplies for him. On cross-examination, Mother admitted she had never before alleged that Grandmother and M.S.K. took the Child from her at gunpoint. She finally conceded that they took the Child with her consent. Mother added, "it's his grandmother. I didn't think anything of it." The following month, Mother gave Grandmother custody of the Child. The consent decree reflected a "temporary" custody change as the result of Mother's inability "to care for [the Child] at this time." Mother said she later requested custody, and Grandmother told her she would return the Child when she felt Mother could care for him. Mother denied any intent to give up her parental rights, but admitted she never took steps to regain custody.

The testimony of Grandmother and Mother regarding Mother's contact with the Child differed sharply. Grandmother noted that, early on, Mother moved from state to state and saw the Child for brief visits when she returned to Tennessee. More recently, Mother only came over on special occasions and whenever she wanted money or something from Grandmother. Grandmother said she was aware that Mother used drugs and for that reason would not allow Mother to visit the Child unsupervised. Mother testified that she always visited regularly, except when she was working or out of town. She testified to visiting

weekly, "at the very least," during 2012. Mother admitted to using crack cocaine, but said it started after Grandmother took the Child from her and she became depressed. Mother testified that she had "self-detoxed" and not used any drugs since August 2008, but then she added that she had not smoked marijuana in the past 10 months. As to child support, Grandmother testified that Mother was employed "off and on," but paid her only $40 in child support before she filed for adoption. Mother admitted she did not give money directly to Grandmother, but said she supported the Child in other ways.

The subject of Father's paternity encompassed much of the proof at trial. Mother testified there were two potential fathers, a man named M.P., and Father. Other witnesses testified Mother had initially named a third man, R.N.[1] According to Grandmother, DNA tests in 2008 and 2009 ruled out the other men. Mother never told her that Father was among the potential fathers. M.S.K. recalled that in 2007, Father came to pick up Mother. M.S.K. overhead Father ask Mother if she was pregnant, to which Mother replied that she was. When Father asked if it was his baby, Mother told him, "you're the only one that I've been with, so it must be yours." Grandmother knew Father because he and Mother had dated in 2002 during high school. According to Father, Grandmother had disliked him since then. In 2009, Grandmother learned that Father's mother (Mrs. S.) had taken pictures of the Child outside his daycare. The two women talked and discussed the possibility that Father was the Child's father. Grandmother invited Mrs. S. to have DNA testing of the Child and Father, but heard nothing more from her or Father. DNA testing eventually ruled out the other men. N.N. testified that Mother initially said R.M. was the father, then told her it was Father. A.W., a former girlfriend, met Father in 2009. She testified that Father told her then that he might be the Child's father.

Mother denied ever telling Father that the Child was his or discussing a DNA test until 2012, but admitted that, years earlier, she told Mrs. S. and Father's sister there was a "slight chance" that he was the father. In mid-July, Father found Mother via Facebook and she told him DNA tests showed that none of the other men were the father. Mother said Father never provided support during or after the pregnancy because he had "no clue" that the Child was his. She said Father came to see her when the Child was eighteen months old; when he asked if the Child was his, she lied and told him there was "no possibility." For his part, Father conceded that he "always knew it was a possibility" that he was the Child's father – even though he and Mother had intercourse only once, around the time of conception. Father testified he first asked Mother about paternity in 2009, and Mother told him they were trying to get a DNA test on another man. Father told Mother that if that test proved negative, he would also like to be tested. He moved away to attend school and heard nothing back from

---

[1]The proof indicates that Mother and R.N. were married in 2011 and divorced some ten months later.

Mother.

On July 30, 2012, Father went to Grandparents' home, unannounced, to discuss the Child and stayed for nearly three hours. According to Grandmother, Father told them that he was "there to see [his] son." Grandmother thus learned, for the first time, that Father believed he was the Child's father. According to Grandmother, during the visit, Father told her that Mother had first told him when she was pregnant that the Child was his. Grandmother said when she asked what took Father so long to come tell her, Father said that he had been away at college and "just couldn't afford a DNA test." Both parties agreed that the visit went well, but as Father was leaving, he said he wanted full custody if his paternity was confirmed. This prompted Grandmother to file for adoption. On September 12, 2012, Father filed a petition to establish paternity. On March 1, 2013, Father underwent DNA testing. The results indicated a 99.9996% probability of his paternity.

In October 2012, Mother and Father visited the Child at school without Grandmother's permission. The Child came home and told Grandmother that Mother and Father were planning to come back that night and take the Child with them. As a result, Grandmother obtained a restraining order. In December 2012, the trial court modified the order to grant Mother and Father visitation limited to twice a month. Grandparents said the visits generally went well, but always led to trouble afterwards—the Child experienced nightmares in which he feared that a "big monster" was coming to take him away, and became very clingy and disobedient.

In June 2013, Mother and Father appeared for a child support hearing; they were ordered to pay $202 and $208 per month, respectively.[2] In July 2013, Father and Mother were married. In November 2013, a second child was born to them.

At trial, Mother testified that, for the past two months, she and Father had lived in a trailer on property they bought in Sweetwater. On cross-examination, Mother conceded that Mrs. S. was buying the property and she and Father leased the trailer from her. Mother was fired from her last job in May 2013. Following the birth of her second child, she had recently began searching for employment. The family received food stamps and other government assistance. Father worked sporadically repairing motorcycles.

Grandmother lived at the same address in Loudon since 1999. In 2010, Grandmother married T.W. He was aware that Grandmother had custody of the Child and was "absolutely cool with that." He joined Grandmother's adoption petition. He loved the Child and wanted him in his life. In addition to Grandmother, T.W., and the Child, Mother's two sisters, ages

---

[2]No child support orders are in the record on appeal.

24, and 21, also lived in the home. Grandmother testified that the Child was a big part of their family and she "loved [him] as if he was [her] own."

At the conclusion of the hearing, the court announced its bench ruling finding in favor of Grandparents "on all issues in all respects." More specifically, the court found, by clear and convincing evidence, that (1) both Mother and Father abandoned the Child by failing to support and visit him and (2) termination of Mother's and Father's rights to the Child was in the Child's best interest. On January 31, 2014, the court entered a final order terminating both parents' rights to the Child and approving his adoption by Grandparents. Mother and Father each filed a timely notice of appeal.

## II.

Mother and Father each presents the same issues for our review, restated by us as follows:

> 1. Whether the trial court's finding that Mother and Father willfully abandoned the Child by failing to visit and support him in the four months immediately preceding the filing of the petition for adoption is supported by clear and convincing evidence.
>
> 2. Whether the trial court erred in its determination that termination of Mother's and Father's parental rights is in the Child's best interest.

## III.

With respect to parental termination cases, this Court has observed:

> It is well established that parents have a fundamental right to the care, custody, and control of their children. While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child." Both of these elements must be

-5-

established by clear and convincing evidence. Evidence
satisfying the clear and convincing evidence standard establishes
that the truth of the facts asserted is highly probable, and
eliminates any serious or substantial doubt about the correctness
of the conclusions drawn from the evidence.

*In re Angelica S*., E2011-00517-COA-R3-PT, 2011 WL 4553233 at \*11-12 (Tenn. Ct. App.
E.S., filed Oct. 4, 2011) (citations omitted).

"As to the trial court's findings of fact, our review is de novo with a presumption of
correctness unless the evidence preponderates otherwise." *In re M.J.B.*, 140 S.W.3d 643,
654 (Tenn. Ct. App. 2004); Tenn. R. App. P. 13(d). Our role is to determine "whether the
facts, as found by the trial court or as supported by the preponderance of the evidence, clearly
and convincingly establish the elements necessary to terminate parental rights." *Id*. at 654.
Great weight is accorded the trial court's determinations of witness credibility, which
findings will not be disturbed absent clear and convincing evidence to the contrary. *See
Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo
with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741 (Tenn.
2002).

IV.

A.

The trial court terminated Mother's and Father's parental rights pursuant to Tenn.
Code Ann. § 36-1-113(g)(1). That section provides grounds for termination based on
abandonment of a child, as further defined at § 36-1-102(1)(A)(i). The latter section provides
as follows:

For a period of four (4) consecutive months immediately
preceding the filing of a proceeding or pleading to terminate the
parental rights of the parent(s) or guardian(s) of the child who
is the subject of the petition for termination of parental rights or
adoption, that the parent(s) or guardian(s) either have willfully
failed to visit or have willfully failed to support or have willfully
failed to make reasonable payments toward the support of the
child[.]

Further, "'token visitation' means that the visitation, under the circumstances of the
individual case, constitutes nothing more than perfunctory visitation or visitation of such an

infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C). For purposes of establishing abandonment in the present case, the relevant four-month period runs from May 4, 2012 until September 3, 2012, the day before the petition for adoption and termination was filed.

Both Mother and Father challenge the trial court's finding that they abandoned the Child by failing to visit and support him. We address the termination order as to each parent, in turn. We proceed mindful that only a single ground must be sufficiently proven in order to justify the termination of parental rights. *See* Tenn. Code Ann. § 36-1-113(c).

B.

We begin with Mother. The trial court found that she exercised only token visitation with the Child and that she failed to support him during the four-month period. As to Mother, the court stated, in relevant part, as follows:

> [T]he question is: Has she abandoned [the Child]? [. . . .] And I would find that [Mother] did within four months next preceding the filing of the petition fail to make any meaningful support or have any meaningful contact with [the Child]. . . .
>
> [S]he may have seen him periodically, but it was only token visitation and zero support, and . . . the evidence is clear and convincing that [Mother] was involved in the drug culture, . . . and it was, at the very least, a promiscuous lifestyle with multiple men in different places, in Tennessee, Texas, Florida, other places at times when [Grandmother] did not know her location or how to get in touch with her.
>
> \* \* \*
>
> And I believe the testimony of [M.S.K.] with regard to the location and condition of both [Mother] and [the Child], . . . and that it was a rescue.
>
> That is the way I see it, a rescue of this child from [his] mother. The [C]hild was in need of absolute care by competent adults at that point, and at that point in time, [Mother] was incapable, unable to provide that, and that the [C]hild was essentially rescued by [Grandmother] and taken to her home, where the

[C]hild remains today.

And I find that the evidence regarding her abandonment to [have]. . . be having been shown by clear and convincing evidence. I find that her testimony regarding her contacts with the [C]hild during the four months next preceding the filing of the adoption petition are false. . . .

\* \* \*

And I do not, as she sits here today in the courtroom, I do not believe her or trust her or accept her testimony in any respect regarding these issues. And I essentially accept the testimony of [Grandparents] and their witnesses regarding [Mother's] conduct prior to the filing of the adoption petition.

The trial court's determination that Mother's testimony is wholly devoid of credibility is significant. In weighing the preponderance of the evidence, great weight is accorded the trial court's determinations of witness credibility, which shall not be reversed absent clear and convincing evidence to the contrary. *See Jones*, 92 S.W.3d at 838. In *Lockmiller v. Lockmiller*, No. E2002-02586-COA-R3-CV, 2003 WL 23094418 at \*4, (Tenn. Ct. App. E.S., filed December 30, 2003), this Court emphasized the deference properly accorded a trial court's credibility determination. We observed:

> The credibility of witnesses is a matter that is peculiarly within the province of the trial court. That court has a distinct advantage over us: it sees the witnesses *in person*. Unlike an appellate court - which is limited to a "cold" transcript of the evidence and exhibits - the trial court is in a position to observe the demeanor of the witnesses as they testify. This enables the trial court to make assessments regarding a witness's memory, accuracy, and, most importantly, a witness's truthfulness. The cases are legion that hold a trial court's determinations regarding witness credibility are entitled to great weight on appeal. In the absence of unrefuted authentic documentary evidence reflecting otherwise, we are loathe to substitute our judgment for the trial court's findings with respect to the credibility of the witnesses.

(emphasis in original; citations omitted).

At trial, Grandmother testified to a 2012 calendar that she used to record Mother's visits. Focusing on the critical four months, no visits were noted during May or June. There were three visits during July – on July 11 for 10 minutes "to borrow gas money"; on July 19 "to shower and borrow a tent"; and on July 29 to return the tent and shower again. Father's three-hour visit on July 30 was also noted. Two visits were reflected in August. On August 12, Mother came to celebrate her birthday; she brought her then-boyfriend, his children, and his brother and mother, and stayed for three hours. On August 24, Mother came over and then accompanied Grandmother and the Child to McDonald's. According to Grandmother, Mother had little to no interaction with the Child during these visits; she talked or texted on her cell phone or was otherwise occupied. No visits were noted in September. With respect to child support, Mother made one $40 payment in 2008. As earlier noted, Mother was ordered to pay child support beginning in July 2013. Child support records reflected that as of the time of trial, Mother had made one payment for $200 in August 2013—well beyond the four-month period.

Mother testified that in the months leading up to the filing of the adoption petition, she was employed at "CVG" working 50-72 hours a week. Mother said she had little time to visit the Child, but insisted that she saw him "once a week, at the very least," and sometimes more often. She testified she earned a minimum of $500 a week. Although not noted on Grandmother's calendar, Mother reiterated she was certain there were other visits, including a visit on May 5th for her sister's birthday. Mother also claimed that she saw the Child every Sunday in June and some six times in July. Mother explained she was laid off at the end of July and had more free time that month.[3] Mother denied that she only came to Grandmother's house in July for money or to take a shower; she explained that since she was working then, she had no reason to ask Grandmother for help. Mother conceded that after Grandmother obtained custody, she never gave her any money for the Child because she feared it would be spent on "extravagant vacations." Instead, she said, she bought supplies and helped pay for his daycare.

Faced with resolving such disputed testimony, the trial court expressly credited Grandmother's testimony over Mother's accounts of Mother's contacts with and support for the Child. This was certainly within the court's province. Moreover, M.S.K. testified to similar effect. She stated: "I still love [Mother], but [she] was not a good mama. She did not come around [the Child]. She didn't supply for [the Child]. She didn't do nothing about that concern." Thus, we put aside Mother's repeated assertions that she visited the Child "once a week, at the very least" – more often and for longer periods of time – than acknowledged by Grandmother. To the contrary, the proof indicated that Mother "saw" the Child only five

_____

[3]N.N., who worked for the same company, testified that Mother told her she was fired after failing a drug test.

-9-

times in the critical four months. These visits, however, were to Grandmother's house, but not necessarily to see the Child.

We agree that the few "visits" Mother engaged in were "token" in nature – Mother primarily stopped by Grandmother's house for her own needs or purposes, not to spend quality time of any length with the Child. The trial court's finding that Mother abandoned the Child by failing to support him is also supported by the record. Mother made one $40 payment in the five years after Grandmother obtained custody, until a support order was entered. She testified she was working up to 72 hours a week, but conceded she gave none of the money to Grandmother for the Child.

Giving proper deference to the trial court's assessment of the witnesses, we conclude that the evidence does not preponderate against the trial court's finding, said to be made by clear and convincing evidence, that Mother abandoned the Child. The trial court did not err in terminating Mother's rights on the ground of abandonment by failure to visit and support the Child as defined at Tenn. Code Ann. § 36-1-102(1)(A)(i) & (C).

C.

We next consider Father. En route to finding that Father abandoned the Child by failing to visit or support him, the trial court stated as follows:

> [W]ith regard to [Father], . . . one of the issues is just what responsibility he had in this. . .
> * * *
>
> There were two other men that [Mother had] been having sex with, but . . . . [A]ll it takes is one time, and that's apparently, . . . all it took for [Father] to cause a child to come into this world. And [Mother] had told him back then that there was a chance that he was the father . . .of this child.
>
> It continued . . . to be discussed within [Father's] family to the point that they found out in 2009 that the [C]hild was at a particular daycare, where [Mrs. S.] then went and took . . . photographs of the [C]hild, and came back . . . according to [Father's] own admission that she couldn't say for sure. . . . But there was definitely a chance that he was the father, just from the [C]hild's appearance. And that was when the [C]hild was two years old.

-10-

* * *

> [Father] learned . . . the middle of July 2012 that the DNA test on the other man . . had come back negative. . . . So what does [Father] do on July 30? He goes to [Grandparents] home and says that he wants to assert his rights and to be tested and to have these, all of these things that he's now seeking to become a reality for him and his son.
>
> Only, by then the [C]hild is . . . five years old at that point. . . . Five years have gone by, and he hasn't paid a penny. He hasn't contacted the [C]hild one time. He had never . . . even laid eyes on the [C]hild, except through the photographs that his mother took. And so there was no contact. There was no support, no visitation, no communication, no nothing between [Father] and his son for four months next preceding the filing of the petition.
>
> I find that by clear and convincing evidence. I find that he had the responsibility since he knew . . . that he could be the father, and he did nothing even though he admits that . . . sometime during that period – 2007, 2008, 2009 – he had the financial ability to support the [C]hild.

The trial court properly summarized the relevant facts and applied the law. As the court observed, Father knew as far back as 2007 that he might be the Child's father, but took no action and thereby avoided his parental obligations for years. Even after he acknowledged to Grandparents that the Child was his, he continued to sit back and do nothing for a time. As the trial court found, the evidence is clear and convincing that Father abandoned the Child – aside from first meeting the Child in July, Father had no visits and paid nothing to support the Child before the petition was filed. Even after his support obligation was formalized – well after the relevant four-month period – Father failed to consistently pay child support as ordered.

The evidence does not preponderate against the trial court's finding of "no support, no visitation, no communication, no nothing between [Father] and his son for four months next preceding the filing of the petition." The trial court did not err in terminating Father's parental rights on the ground of abandonment by failure to visit and support the Child.

.

At this juncture, we find it appropriate to address alternative grounds for termination with respect to Father. In addition to abandonment, Grandparents' petition alleged, in relevant part, that Father's rights should be terminated on the following grounds:

> [Father] was notified during the pregnancy of [Mother] that he was the father of the child. [Father] has failed to file a petition to establish paternity of the child within thirty (30) days after notice of the alleged paternity by the child's mother or within thirty (30) days of the child's birth.
>
> \* \* \*
>
> [Father] personally notified your Petitioners [Grandparents] on July 30, 2012 that he is making a claim of paternity. [Father] has failed to file a petition to establish paternity of the child within thirty (30) das after making a claim of paternity to your Petitioners.
>
> \* \* \*
>
> [Father] has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the child in accordance with Tennessee Child Support Guidelines.

We return to Tenn. Code Ann. § 36-1-113. With respect to grounds for termination, the statute further provides, in relevant part, as follows:

> The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person or, if no such petition is filed, at the time of the filing of a petition to adopt a child, is not the legal parent or guardian of such child or who is described in § 36-1-117(b) or (c) may also be terminated based upon any one (1) or more of the following additional grounds:
>
> \* \* \*
>
> (ii) The person has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the child in accordance with the child support guidelines promulgated by

-12-

the department pursuant to § 36-5-101;

\* \* \*

(vi) The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity by the child's mother, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(3).

Tenn. Code Ann. § 36-1-113(g)(9)(A)(ii), (vi). As can be seen, the allegations in the petition essentially track the quoted provisions of Section 36-1-113(g)(9)(A) by alleging Father's failure to establish paternity and his failure to pay child support under the Guidelines as additional grounds for termination. The grounds for termination under Section 36-1-113(g)(9)(A) are "additional" to those set forth in Section 36-1-113(g)(1-8) and are applicable "only to cases in which no legal relationship between the parent and child has been established." *Jones*, 92 S.W.3d at 839.

The Supreme Court has explained that the "determination of the child's legal father is a two-step process. First, we look to the parentage statutes, . . . to determine the child's father. Then, we look to the adoption and termination statutes to determine whether the parentage father is also the legal father." *In re T.K.Y.*, 205 S.W.3d 343, 349 (Tenn. 2006). Under the termination and adoption statutes, "the biological father is not automatically the legal father of a child. Rather, he is only the legal father if he is married to the mother at the probable time of conception or if he has been adjudicated to be the legal father." *Id.* at 352 (citing Tenn. Code Ann. § 36-1-102(28)).

A father who establishes paternity prior to a termination proceeding[4] should be permitted to enjoy the benefit of having established paternity. One such benefit is to be exempt from the additional grounds for terminating parental rights under Tennessee Code Annotated section [36-1-113(g)(9)(A)].

*Jones*, 92 S.W.3d at 840. In the present case, Father is presumed to be the Child's "father" under the parentage statutes based on the results of genetic testing. *See* Tenn. Code Ann. § 36-2-304(a)(5)(providing that a man is rebuttably presumed to be the father of a child if genetic test results "show a statistical probability of parentage of ninety-five percent (95%)

---

[4]In 2003, after the *Jones* decision, Section 36-1-113(g)(9)(A) was amended to provide that it did not apply to persons who had established parentage *as of the time the petition was filed*, rather than as of the time of the termination hearing. (Emphasis added.)

or greater."). Moreover, he has stipulated that he is the biological father. At the time the adoption petition was filed, however, his paternity had not been adjudicated so that he was not also the "legal father." As a result, the additional grounds for termination under Section 36-1-113(g)(9)(A), including the failure to timely establish paternity, are applicable to Father.

As set out in earlier in this opinion, in its bench ruling, the trial court repeatedly found, by clear and convincing evidence, that Father had a responsibility to take action to establish his paternity after being notified as far back as 2007 by Mother that the Child may be his. More recently, Father held himself out as the Child's father when he came to see the Child and discussed his paternity with Grandparents in July 2012. Yet he did not file a petition for paternity and never supported the Child, until after the adoption petition was filed. The trial court correctly concluded that Father had certain responsibilities toward the Child but did "nothing" to become a legal father before the adoption petition was filed.

Based on the foregoing, we conclude that, in addition to abandonment pursuant to Section 36-1-113(g)(1), additional grounds exist for terminating Father's rights to the Child. In its "Final Order of Adoption," the trial court stated its finding "by clear and convincing evidence pursuant to Tenn. Code Ann. § 36-1-113, that the grounds for termination of parental rights have been established for . . . [Father]. . . ." In our view, grounds pursuant to Tenn. Code Ann. 36-1-113(g)(9)(A)(ii) and (vi) were not only properly pleaded and litigated at trial, but implicitly found by the trial court.

In summary, the evidence does not preponderate against the trial court's findings in support of its termination order. The trial court properly terminated Father's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(1), as defined in Tenn. Code Ann. § 36-1-102(1)(A)(i), and Tenn. Code Ann. § 36-1-113(g)(9)(A)(ii) and (vi).

V.

Having found that grounds for termination exist, we next consider the "best interest" issue. We are guided on our review by the non-exclusive list of statutory factors set forth at Tenn. Code Ann. § 36-1-113(i).

We quote pertinent portions of the trial court's findings in support of its "best interest" analysis:

> Everything that I've heard thus far is that this [C]hild is being well cared for, is in a stable, happy home. . . .
>
> And I find that it's in the best interest of this [C]hild that he be

adopted by [Grandparents] . . . , and that if [Mother and Father] are to have any contact with the [C]hild then it's going to be up to them to work that out in the future with [Grandparents] and not through a court. . . . That's going to require them to prove to [Grandparents] that they are now the people that they say they are, that their lives have changed.

[T]here's no question in my mind that this child is better off with [Grandparents], that there's no guarantee if he were to be placed back in the custody of either [Mother or Father] that his life would ever be free from the kind of ephemeral, arbitrary, capricious type of lifestyle that the mother has been living for all of these years, and I'm just not going to do that to this little boy.

I'm going to give him to [Grandparents] and I think the law . . . does that. I think all I do is find the facts. I find the facts to be clear and convincing and in favor of [Grandparents] and against [Mother and Father] in all respects. It's [a] clearcut case to me.

By the time of trial, the Child had been in Grandmother's custody for over five years. As the trial court saw it, Grandmother essentially "rescued" the Child from Mother, took him into her home, and cared for him from that point on as if he were her own. Mother was content to allow Grandmother to assume the parental responsibilities that she was admittedly unable to undertake because of her drug use and unstable lifestyle. Once the responsibility for the Child was lifted from her shoulders, however, Mother did little to nothing to build a meaningful relationship with him. She had little time for him and even less inclination to support him. As to Father, he conceded that there was always the possibility that he was the Child's father, going back to when he first learned Mother was pregnant. As earlier discussed, however, Father was seemingly content to allow Grandmother to take all the responsibility for the Child's welfare. Apparently, he did not consider confirming his paternity in the years that followed to be a pressing issue. Before this Court, both parents claim they have made strides toward living more stable, productive lives. Mother asserts that she has been drug free for a year, she and Father are married, and they have obtained stable housing. Father asserts he is "willing and able to care for the [C]hild." Both essentially conclude, as Mother puts it, that their "present day circumstances . . . do[] not merit severance" of their rights to the Child.

The proof gave some indication that Mother and Father have begun to take their lives in a positive direction. Their desire to include the Child, together with his newborn sister, into the newly formed family is understandable. We are mindful, however, that "the best interest

of the child is to be determined from the perspective of the child rather than the parent[s]." ***In re B.D.***, No. M2008-01174-COA-R3-PT, 2009 WL 528922 at *18 (Tenn. Crim. App. M.S., filed Mar. 2, 2009)(citing ***White v. Moody***, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)). Stated otherwise, "once grounds have been established, the best interests of the children become the paramount focus of the trial court." ***Id***. (quoting ***In re D.P.M, S.H., and Y.M.***, 2008 WL 4693725, at *11 (Tenn. Ct. App. 2008)).

The trial court essentially found that Mother and Father had not demonstrated sufficient, lasting adjustments in their conduct or circumstances so as to make it safe for the Child to be placed with them. Neither had supported him in the past and the proof indicated that neither had obtained a stable income at the time of trial. Moreover, there was no indication that either parent had developed a meaningful relationship with the Child. Further, if the fears he expressed and the behavior he showed following his visits with Mother and Father are any indication, permanently changing the Child's caregivers and his living environment at this point would prove emotionally and psychologically difficult for him. Even so, Grandmother testified that if the adoption were approved, she would still allow Mother to be part of the family and see the Child provided that the visits were civil.

In summary, we agree with the trial court's assessment that allowing the Child to become a permanent part of the family he found with Grandparents best serves the Child's interests. Clear and convincing evidence exists to show that terminating Mother's and Father's rights and permitting his adoption by Grandparents is in the Child's best interests. The trial court's best interest determination is affirmed.

VI.

The judgment of the trial court terminating Mother's and Father's parental rights to the Child, E.L.R., is affirmed. Costs on appeal are taxed to the appellants, S.R. and D.M.S. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and the collection of costs assessed below

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE

-16-