# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### June 21, 2016 Session

## KATRINA PARRISH v. MICHAEL GRIGGS

**Appeal from the Juvenile Court for Hardin County**
**No. 2014-JV-1385   James Y. Ross, Judge**

_____

**No. W2015-02504-COA-R3-JV – Filed May 25, 2017**

_____

This appeal involves a petition to establish paternity, which was filed when the child was a teenager. DNA testing established the father as the biological father of the child. In the father's counter-petition for custody, he claimed that, shortly after the child's birth, the mother informed him that he was not the child's father. After a two-day trial, the juvenile court entered an order establishing the father's parentage, naming the mother primary residential parent, and changing the child's surname to the father's surname. The court also ordered the father to pay child support retroactive to the date of the child's birth. On appeal, the father challenges the court's decision regarding retroactive child support and the court's exclusion of certain documents from the appellate record. After reviewing the record, we conclude that the juvenile court did not abuse its discretion in denying the father's request for a deviation from the child support guidelines. We also conclude that the court's error in excluding documents from the appellate record was harmless in this instance. However, we conclude that the court erred in ordering the child's surname to be changed from Mother's to Father's. Therefore, we affirm in part and reverse in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part and Reversed in Part**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which KENNY W. ARMSTRONG, J., and DAVID R. FARMER, SP. J., joined.

Mary L. Wagner,[1] Memphis, Tennessee, for the appellant, Michael Griggs.

Katie P. Hagenbrok and Ryan M. Hagenbrok, Savannah, Tennessee, for the appellee, Katrina Parrish.

_____
[1] After this case was argued, we granted the motion of Ms. Wagner, now Judge Wagner, to withdraw as counsel for the appellant.

# OPINION

## I.

In 1995, Katrina Parrish ("Mother") and Michael Griggs ("Father") entered a five-year relationship, which produced a child, Ashton. At the time their relationship began, both Mother and Father resided in Illinois. In 1996, Mother relocated to Tennessee to live with her parents, but despite Mother's move, the parties continued dating. Although both agree that their relationship had begun to deteriorate, the proof indicates that Father knew Mother had become pregnant. After the child's birth in the spring of 2000, Father visited Mother and Ashton on a number of occasions and voluntarily provided Mother with two child support payments of $400. The parties ended their relationship in September or October of that year, and Father ceased contact with both Mother and the child. The details of the parties' split are disputed and lie at the center of the present appeal.

### A. LEGAL PROCEEDINGS

On April 30, 2014, when Ashton was 14 years old, the State of Tennessee filed a Petition to Establish Paternity on Mother's behalf in the Juvenile Court of Hardin County, Tennessee. The juvenile court subsequently ordered DNA testing, which established Father as the biological father of the child.

On July 17, 2014, Father filed a counter-petition for visitation. Mother retained her own counsel, and the State of Tennessee withdrew from further involvement in the case. On January 23, 2015, the parties entered into an agreed order establishing an interim parenting plan, which allowed Father visitation and required the parties to attend counseling to help integrate Father into Ashton's life. The parties also entered a separate agreed order establishing Father's parentage and setting interim child support.

Thereafter, Father filed a second counter-petition seeking to be awarded primary residential parent status or, in the alternative, "shared parenting." In his petition, Father claimed that in the fall of 2000, "Mother told Father that he was not the father of Ashton" and that he was told to stop calling Mother and attempting to visit with the child. Father further alleged that "Mother knew that Ashton was, in fact, the child of Father but willfully prevented a relationship between Father and Ashton by misrepresenting Ashton's paternity . . . ." In Mother's answer, she denied Father's allegations and requested continued child support until the child reached the age of 18 and an award of retroactive child support from the child's date of birth based on the amount agreed to in the consent order for interim child support.

The juvenile court held a trial over two days in June and August 2015, on the issues of retroactive child support and custody. Both parents testified to their memories of their interactions in the months surrounding the child's birth.

Mother testified that she started dating Father in 1995 after her divorce. At the time she had two young children. Her ex-husband was the father of her youngest child, and the two were engaged in an ongoing custody battle. In 1996, Mother moved from Illinois to Tennessee because she lost her job and wanted to live closer to her family. Despite the long distance, Mother and Father continued their relationship for several years. They would spend time together when Mother took her youngest child to Illinois for visits with her ex-husband. Father also frequently visited Mother in Tennessee.

She claimed that her relationship with Father had been on the decline when she found out she was pregnant with Ashton in 1999. According to Mother, she informed Father of her pregnancy, but due to his and his family's religious beliefs, Father was ashamed to have a child out of wedlock. Mother testified that Father had pressured her to abort two prior pregnancies and paid for her to obtain the abortions. Although Father did not want his parents to find out about Mother's pregnancy with Ashton, Mother and Father did eventually meet with Father's parents in Illinois to inform them of Ashton's existence.

Mother gave birth to Ashton in the spring of 2000. But she did not inform Father of Ashton's arrival until after she delivered. And she did not name a father for Ashton's birth certificate. In the months after the child's arrival, Father sent Mother two child support checks of $400 each and bought other various necessities for the child, including diapers, formula and a playpen. Mother also recalled Father traveling to Tennessee to visit the child on at least two occasions, once accompanying Mother to a doctor visit. She testified that Father paid the bill for the child's doctor visit that day.

Mother vehemently denied ever telling Father that Ashton was not his biological child. She also denied that Father ever requested a paternity test. Rather, Mother claims that she asked Father to take a paternity test to legitimize the child on several occasions. According to Mother, each time she made such a request, Father would get angry and make threats to take Ashton away from Mother if she continued to push the paternity issue. Mother admitted that she told Father that he would have to prove Ashton was his child. She claimed that, in one such argument, she told him that "if he wanted custody he would have to prove that she was his" and that he would "have to get a DNA [test]."

She recalled that her relationship with Father ended sometime after that conversation. In September 2000, less than a year after the child was born, Father stopped contacting her. She testified that, although she felt threatened by Father not to pursue a paternity test, in the years following the child's birth, she filed several applications with the Tennessee Department of Children's Services to attempt to establish

3

Father's paternity. Still, the only petitions for paternity entered into evidence were filed in 2012 and 2013.

Father's version of the events that transpired in 1999-2000 differed from Mother's in several respects. He claimed that, upon learning of Mother's pregnancy in the fall of 1999, he was "excited" and wanted her to move back to Illinois with him. Father admitted that, prior to Mother's pregnancy with Ashton, he financed one of Mother's abortions; however, he claimed that he did not know if he was the father of Mother's unborn child.

Father later testified that he had doubts that Ashton was actually his. He claimed that he paid child support because he was "trying to do the right thing" and that he visited the child to see if she bore any resemblance to him. But, in actuality, Father considered the turbulent nature of his relationship with Mother and questioned Mother's fidelity. He indicated that, when Mother lived in Illinois at the beginning of their relationship, he questioned whether Mother's relationship with her male roommate was sexual in nature. Father further testified that he developed a sexually transmitted disease while in a supposedly monogamous relationship with Mother. Additionally, Father believed that he could be sterile due to a childhood illness. He testified that he asked Mother for a paternity test on several occasions both before and after Ashton's birth, but Mother refused.

In October of 2000, Father claimed that Mother called and "basically told [him]" that Ashton was not his child. According to Father, his mother, Patricia Griggs, was present when he received the phone call from Mother and overheard the conversation. Ms. Griggs confirmed Father's recollection of the phone call through her testimony, claiming that she also heard Mother say that Ashton was not Father's child.

Father also offered the deposition testimony of two other witnesses to bolster his testimony. Mother's estranged brother, Billy Parrish, stated that Mother told him, on more than one occasion, that Father was not Ashton's biological father. Mother's cousin, Beth Jackson, explained that she saw Mother in the grocery store after Ashton's birth. Ms. Jackson claimed that, when asked about Father, Mother responded by stating that she told Father that Ashton was not his child and that he was "out of the picture."

Although Father admitted that he knew there was a possibility that the child was his, he never filed a paternity action. He testified that he did not have reason to believe that Mother would lie to him about the child's paternity. Afterwards, Father ceased visiting and contacting both Mother and Ashton. He claimed that he did not receive further contact from Mother, or any attorney representing Mother, until the 2014 petition to establish his paternity was filed.

4

## B. JUVENILE COURT'S ORDERS

After hearing the parties' proof, the juvenile court found, among other things, that Father knew of his parentage and could have established paternity. The court, therefore, determined that Father failed to establish, by clear and convincing evidence, that a deviation from the child support guidelines was appropriate and awarded Mother retroactive child support to the date of Ashton's birth.

On October 28, 2015, the juvenile court entered an Order of Parentage and Permanent Parenting Plan, which named Mother the primary residential parent and Father as the alternative residential parent. In addition to prospective child support, the court ordered Father to pay retroactive child support in the amount of $160,477[2] in monthly payments of $1,183.50. Finally, the court ordered Ashton's surname to be changed to Father's surname.

Father filed a timely notice of appeal. On December 7, 2015, Father filed a designation of the appellate record, and two days later, he filed an amended designation. Thereafter, Mother filed a designation of the record of her own. In response, Father filed a supplemental designation of the record. Both parties filed motions to strike certain portions of the opposing party's designation of the record.

On January 21, 2016, the juvenile court held a telephonic hearing concerning the competing motions. The court entered an order excluding several items from the appellate record, including two orders concerning preliminary matters and several post-judgment filings. The court also redacted Father's response to the State's motion to quash a subpoena and several pages of the trial transcript recorded while the court was in recess.

## II.

On appeal, Father does not challenge the juvenile court's designation of Mother as the primary residential parent. Rather, the issues he raises pertain to the retroactive child support award and the exclusion of certain items from the appellate record. Additionally, Mother asks this Court to reverse the juvenile court's decision to order the child's surname to be changed to Father's surname.

## A. STANDARD OF REVIEW

In non-jury trials, we review the trial court's factual findings de novo on the record, with a presumption of correctness, unless the evidence preponderates otherwise.

---

[2] This number was derived by using the parties' average incomes for the years 2000 to 2015, as stipulated by the parties at trial.

Tenn. R. App. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). Evidence preponderates against a finding of fact if the evidence "support[s] another finding of fact with greater convincing effect." *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001). We review the trial court's conclusions of law de novo with no presumption of correctness. Tenn. R. App. P. 13(d).

## B. RETROACTIVE CHILD SUPPORT

"In this state, it is a well-settled principle that biological parents must, as a general rule, support their children until they reach the age of majority." *K.A.G. v. B.L.I.*, No. M2008-02484-COA-R3-JV, 2009 WL 4175861, at *3 (Tenn. Ct. App. Nov. 25, 2009) (citing Tenn. Code Ann. § 34-1-102(a), (b) (2001); *Smith v. Gore*, 728 S.W.2d 738, 750 (Tenn. 1987)). This obligation is one that exists "regardless of whether a court order exists, and regardless of whether the parents were ever married." *State ex rel. Hayes v. Carter*, No. W2005-02136-COA-R3-JV, 2006 WL 2002577, at *2 (Tenn. Ct. App. July 6, 2006).

A court, when establishing a child's paternity, must address the child's need for future support as well as whether to make an award of retroactive support. Tenn. Code Ann. § 36-2-311(a)(11) (2014); *K.A.G.*, 2009 WL 4175861, at *3 (quoting *Carter*, 2006 WL 2002577, at *2). The trial court's decision regarding whether to award retroactive child support is reviewed under an abuse of discretion standard. *State ex rel. Kennamore v. Thompson*, No. W2009-00034-COA-R3-JV, 2009 WL 2632759, at *2 (Tenn. Ct. App. Aug. 27, 2009) (citing *State ex rel. Coleman v. Clay*, 805 S.W.2d 752, 755 (Tenn. 1991)). Still, the court's discretion is cabined by Tennessee Code Annotated § 36-5-101(e)(1)(A) (Supp. 2016), which states that "the court shall apply, as a rebuttable presumption, the child support guidelines." In paternity cases, specifically, the Guidelines impose a presumption that retroactive child support will be awarded "[f]rom the date of the child's birth." Tenn. Comp. R. & Regs. 1240-02-04-.06(1)(a). The Guidelines, however, acknowledge that this presumption is one that can be rebutted if the "provisions of Tennessee Code Annotated §§ 36-2-311(a)(11) or 36-5-101(e) have been established by clear and convincing evidence provided to the tribunal." *Id.*

By enacting § 36-2-311(a)(11), "[o]ur legislature has recognized that under certain circumstances it would be inequitable to order a father to pay child support retroactive to the child's birth." *Taylor v. Robinson*, No. M2006-00109-COA-R3-JV, 2007 WL 1628862, at *5 (Tenn. Ct. App. June 5, 2007). It provides, in relevant part:

> (A) . . . When making retroactive support awards pursuant to the child support guidelines established pursuant to this subsection (a), the court shall consider the following factors as a basis for deviation from the presumption in the child support guidelines that child and medical support

for the benefit of the child shall be awarded retroactively to the date of the child's birth:

(i) The extent to which the father did not know, and could not have known, of the existence of the child, the birth of the child, his possible parentage of the child or the location of the child;

(ii) The extent to which the mother intentionally, and without good cause, failed or refused to notify the father of the existence of the child, the birth of the child, the father's possible parentage of the child or the location of the child; and

(iii) The attempts, if any, by the child's mother or caretaker to notify the father of the mother's pregnancy, or the existence of the child, the father's possible parentage or the location of the child;

(B) In cases in which the presumption of the application of the guidelines is rebutted by clear and convincing evidence, the court shall deviate from the child support guidelines to reduce, in whole or in part, any retroactive support. The court must make a written finding that application of the guidelines would be unjust or inappropriate in order to provide for the best interests of the child or the equity between the parties.

Tenn. Code Ann. § 36-2-311(a)(11).

Here, the statutory factors enumerated in § 36-2-311(a)(11)(A) are inapplicable. As our Supreme Court has stated, that section "only contemplates excusing retroactive child support to the date of birth in circumstances where the father was not aware of the existence of the child." *In re T.K.Y.*, 205 S.W.3d 343, 355 (Tenn. 2006). The evidence establishes that Father clearly knew about Ashton's existence and his possible parentage, and Father conceded as much at oral argument.

Even so, in considering whether to award child support retroactively, "[t]he statute further provides . . . that the court may consider 'the equity between the parties.'" *Id.* (quoting Tenn. Code Ann. § 36-5-101(e)(1)(A)). Though the Supreme Court cited the statute that applies to child support orders generally,[3] the language of Tennessee Code

---

[3] Tennessee Code Annotated § 36-5-101(e)(1)(A) provides, in relevant part:

In making the court's determination concerning the amount of support of any minor child or children of the parties, the court shall apply, as a rebuttable presumption, the child support guidelines, as provided in this subsection (e). If the court finds that evidence is sufficient to rebut this presumption, the court shall make a written finding that the application of the child support guidelines would be unjust or inappropriate in that

7

Annotated § 36-5-101(e)(1)(A) "is essentially mirrored in Section 36-2-311(a)(11)(B), recited above, discussing deviation from a presumptive award of full retroactive support in paternity cases." *K.A.G.*, 2009 WL 4175861, at *6.

On appeal, Father asserts that the juvenile court abused its discretion by denying his request for a deviation from the presumption that he was responsible for child support back to the date of the child's birth. Father's argument is primarily based on his claim that, in October of 2000, Mother informed him that he was not Ashton's biological father. But he also argues that the juvenile court failed to apply the correct legal standard. Specifically, Father claims the court "refused to address the equities between the parties."

We find Father's arguments unavailing. Not only does the court specifically cite Tennessee Code Annotated § 36-2-311(a)(11)(B) in its order, but a review of the trial transcript also reveals that the court considered the equities between the parties. In fact, the juvenile court found that Father failed to establish, by clear and convincing evidence, that the equity between the parties justified a deviation from the Guidelines.

The juvenile court concluded that "Father did know he was the father of [the child] and he could have established paternity, and relationship of father and child, prior to the filing of Mother's petition." We are cognizant of the fact that our review is limited due to the deferential abuse of discretion standard and that "a trial court abuses its discretion only when it 'applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" *Williams v. Baptist Mem'l Hosp.*, 193 S.W.3d 545, 551 (Tenn. 2006) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). This standard does not permit us "to substitute [our] judgment for that of the trial court." *Id.*

With these principles in mind, we conclude that there was no abuse of discretion. The juvenile court applied the correct legal standard, and the evidence does not preponderate against the juvenile court's factual findings.

The evidence suggests that, even if Mother did later recant her statement that Ashton was Father's child,[4] Father should have known, or strongly suspected, that he was

---

particular case, in order to provide for the best interest of the child or children, or the equity between the parties.

[4] We note that Father also argues that the juvenile court erred in finding Mother to be a credible witness. He asserts that the testimony of his witnesses contradicts Mother's testimony and supports his own. However, "[i]t has long been recognized that the trial court is in the best position to determine whether a witness's testimony is credible." *In re Estate of Oakley*, No. M2014-00341-COA-R3-CV, 2015 WL 572747, at *12 (Tenn. Ct. App. Feb. 10, 2015). Indeed, "great weight is afforded to the trial court's determinations of witness credibility, which shall not be reversed absent clear and convincing evidence to the contrary." *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). Although

likely the child's father. *Cf. State ex rel. Kennamore v. Thompson*, No. W2009-00034-COA-R3-JV, 2009 WL 2632759, at *5 (Tenn. Ct. App. Aug. 27, 2009) (affirming decision not to award retroactive support where mother fraudulently held the child out as her husband's child and the father had no basis from which to conclude that he was the child's father). Father had been in a relationship with Mother for five years, and he was frequently visiting Mother in Tennessee around the time the child was conceived. Further, the evidence shows that Father and Mother had likely conceived a child on at least one other occasion prior to the Ashton pregnancy. In the months following Ashton's birth, both parents held her out as Father's child, and even if he had some doubts concerning the child's paternity, at least for a time, Father evidently believed Ashton was his. *Cf. Taylor*, 2007 WL 1628862, at *6 (affirming decision to award retroactive support only to the date of paternity petition where mother never clearly notified father of her pregnancy or that she believed he could be the child's father). Father admitted that he believed there was a possibility that he was Ashton's father, but he never petitioned a court to establish paternity. *See id.* ("[T]he statute places duties on both parents in regard to notification and acknowledgment of parentage.").

## C. THE APPELLATE RECORD

Under Tennessee Rule of Appellate Procedure 24, the appellate record must contain "copies, certified by the clerk of the trial court, of all papers filed in the trial court," with certain exceptions, and "the transcript or statement of the evidence or proceedings, which shall clearly indicate and identify any exhibits offered in evidence and whether received or rejected," among other things. Tenn. R. App. P. 24(a). Subsection (a) of Rule 24 goes on to exclude from the record, among other things, "all papers relating to discovery . . . and all notices, motions or orders relating thereto." *Id.* However, "if a party wishes to include any papers specifically excluded in [subsection (a)]," the party may do so by timely filing a designation of the record. *Id.* In such instances, "[a]ll parts of the record described or designated by the parties *shall* be included by the clerk of the trial court as the record on appeal." *Id.* (emphasis added).

Concerning disputes that may arise as to the content of the appellate record, Rule 24 further provides as follows:

> **(e) Correction or Modification of the Record.** If any matter properly includable is omitted from the record, is *improperly included*, or is misstated therein, the record may be corrected or modified *to conform to*

Father's observation that Mother's testimony is contradicted by his witnesses is accurate, we point out that Father's testimony is likewise contradicted by the statements of Mother and her witnesses. We agree that a detailed credibility finding by the trial court would have undoubtedly assisted our review in this "he said, she said" scenario. But even without one, it is not our place to determine that one witness was more credible than another.

> *the truth.* Any differences regarding whether the record accurately discloses what occurred in the trial court shall be submitted to and settled by the trial court regardless of whether the record has been transmitted to the appellate court. Absent extraordinary circumstances, the determination of the trial court is conclusive.

*Id.* (emphasis added). However, "[t]he trial court's authority to add to or subtract from the record is not unlimited." *State v. Housler*, 167 S.W.3d 294, 296 (Tenn. 2005). Subsection (g) of the rule provides:

> **(g) Limit on Authority to Add or Subtract From the Record.** Nothing in this rule shall be construed as empowering the parties or any court to add to or subtract from the record except insofar as may be necessary to convey a fair, accurate and complete account of what transpired in the trial court with respect to those issues that are the bases of appeal.

Tenn. R. App. P. 24(g).

Father argues that the juvenile court erred by excluding properly designated orders and pleadings from the appellate record. As we explained above, the parties filed competing designations of the record, and each filed motions to strike certain portions of the opposing party's designation. By order entered February 12, 2016, the juvenile court excluded several items from the appellate record. Father challenges the exclusion of three items in particular.[5]

First, Father objects to the exclusion of an order of the juvenile court concerning preliminary matters entered prior to trial. According to Father, the order denied Mother's motion to hold the case in abeyance while a tort action between the parties proceeded in federal court. Second, Father argues that the court erroneously excluded an additional order concerning Father's motion to compel discovery. According to Father, the second order includes the juvenile court's findings of negative inferences against Mother due to misstatements she made in her discovery responses.

---

[5] In addition to the listed items, Father also objected to the exclusion of several pages of email correspondence between the parties' attorneys and the juvenile court judge relating to the preparation of the court's final order. Presumably, Mother's attorney was instructed to draft the order, but disagreements arose over the language of the court's ruling. Nevertheless, as Father explained in his reply brief, Father was under the impression that Mother intended to raise an issue on appeal related to the retroactive child support payment schedule. According to Father, because Mother chose not to raise this issue, the mentioned communications are no longer necessary for our review. We, therefore, are of the understanding that Father has chosen to waive the issue of the exclusion of these communications on appeal.

10

Third, Father contends that the court erred by redacting his response to the State of Tennessee's motion to quash a subpoena. Prior to trial, Father issued a subpoena seeking to depose the Custodian of Records of the State of Tennessee. The State responded by filing a motion to quash the subpoena. Father then claims that, in his response, he opposed the State's motion to quash and, alternatively, moved to exclude certain testimony at trial. By order entered June 15, 2015, the juvenile court granted the State's motion to quash but also granted Father's motion to exclude the testimony. Although the juvenile court permitted the State's motion to quash and the June 15, 2015 order to be included in the appellate record, it ordered a portion of Father's response to be redacted.

Although we agree with the juvenile court that the items excluded from the record were not relevant, we also agree with Father that the juvenile court lacked the authority to exclude the challenged items on that basis. Significantly, the court did not find, in accordance with Rule 24(e), that the items were improperly included or did not conform to the truth of what occurred in the proceedings below. We find no authority under the Tennessee Rules of Appellate Procedure for a trial court to exclude a properly designated item from the technical record on the basis of irrelevance.[6]

Nevertheless, any error committed by the juvenile court in excluding the items from the record was harmless. *Id.* 36(b). Father suggests that the two orders excluded from the record show that Mother used litigation tactics as an effort to thwart Father's parenting time, further evidencing her attempt to prevent a relationship between Father and Ashton. But even if we assume, as Father claims, that the orders do in fact demonstrate efforts to prevent his relationship with Ashton, it would not change our analysis above. The evidence still would not preponderate against the finding that Father knew or should have known that Ashton was likely his child. Mother's litigation tactics have no bearing on our decision. Our focus, rather, is on Mother's (and Father's) conduct prior to the filing of the paternity petition in 2014. *See, e.g.*, *Taylor*, 2007 WL 1628862, at \*6 (considering whether mother's pre-petition conduct prevented the formation of a relationship between father and child); *State ex rel. Kennamore*, 2009 WL 2632759, at \*5 (same). We also note that the trial transcript contains the court's statements regarding the negative inferences Father mentions. As a result, this Court was still able to consider those findings in reviewing the record on appeal.

As for Father's redacted responsive pleading, Father argues that his "entire response is necessary to convey a fair, accurate and complete account of what occurred at the trial level." Based on the nature of the subpoena, the State's motion to quash, and the court's order on the matter, we find it safe to assume Father opposed the State's claim of

---

[6] Still, parties should refrain from designating for inclusion in the record on appeal irrelevant materials. *See, e.g.*, *Accredo Health Grp. Inc. v. GlaxoSmithKline LLC*, No. W2015-01970-COA-R9-CV, 2016 WL 4137953, at \*5 (Tenn. Ct. App. Aug. 3, 2016).

11

privilege regarding the requested documents. Father does not argue that the juvenile court erred in granting the motion to quash. And we cannot conceive of a reason, nor does Father offer one, for how the redacted document bears on the issues raised on appeal.

D. CHILD'S SURNAME

Finally, Mother argues that the juvenile court erred in ordering the child's surname to be changed to Father's surname. In its October 28, 2015 order, the juvenile court found "that it is in the best interest of the child, based on the totality of the circumstances and proof, that the surname of the child be that of the Father." Mother asserts, and Father does not dispute, that Father did not request such a name change in the proceedings below.

As this Court has previously explained, in paternity proceedings, "the court's paramount consideration in making the decision to change a surname is whether it is in the best interest of the child, and the party seeking the change bears the burden of proof by a preponderance of the evidence." *Whited v. Fleenor*, No. E2002-01185-COA-R3-JV, 2003 WL 1092968, at *2 (Tenn. Ct. App. Mar. 13, 2003) (citing *Halloran v. Kostka*, 778 S.W.2d 454, 457 (Tenn. Ct. App. 1999)). A change of the child's surname, therefore, is not an inevitable consequence of a paternity proceeding. *Id.*

We conclude that changing the child's surname in this instance was error. Although his paternity has been conclusively established, Father concedes that he did not present evidence that changing Ashton's name is in her best interest. Father also indicated in his brief and at oral argument that he does not contest Mother's argument concerning the child's surname.

**III.**

For the foregoing reasons, we reverse the juvenile court's decision to change the child's surname to Father's surname. We affirm the court's decision in all other respects.

_____
W. NEAL MCBRAYER, JUDGE